UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**SHARON DALLAS, Administratrix of the Estate of**
**CHARLES DUYNES, THE DECEDENT, deceased**

       *Plaintiff,*

                                               **Case No.**

**V.**                                       **DEMAND FOR TRIAL BY JURY**

**VIRGINIA DEPARTMENT OF CORRECTIONS,**

        **SERVE AT:  6900 Atmore Drive**
                     **Richmond, VA 23225**

**HAROLD CLARKE, individually and as Director for the Virginia Department of Corrections,**

        **SERVE AT:  6900 Atmore Drive**
                     **Richmond, VA 23225**

**BETH CABELL, individually and as Warden for Sussex I State Prison,**

        **SERVE AT:  24414 Musselwhite Drive,**
                     **Waverly, Virginia 23891**

**CORRECTIONS OFFICER HUNTER,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department of Corrections,**

        **SERVE AT:  24414 Musselwhite Drive,**
                     **Waverly, Virginia 23891**

**CORRECTIONS OFFICER MISS,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department of Corrections,**

        **SERVE AT:  24414 Musselwhite Drive,**
                     **Waverly, Virginia 23891**

**SERGEANT CRAFT,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department of Corrections,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**CORRECTIONS OFFICER MORRIS,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department**
**of Corrections,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**SERGEANT NOVA,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department**
**of Corrections,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**CAPTAIN JOHNSON,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department**
**of Corrections,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**CORRECTIONS OFFICER LOCKHART,**
**Individually and as an employee for the Sussex I State Prison and the Virginia Department**
**of Corrections,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**ARMOR CORRECTIONAL HEALTH SERVICES,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**BENJAMIN T. ULEP, MD**
**Individually and as a Medical Doctor for Sussex I State Prison, the Virginia Department of**
**Corrections, and Armor Correctional Health Services,**

**SERVE AT: 24414 Musselwhite Drive,**
**Waverly, Virginia 23891**

**MICHAEL PICIO, DO**
**Individually and as a Doctor of Osteopathic Medicine for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

      **SERVE AT:   Greensville Correctional Center**
                    **901 Corrections Way**
                    **Jarrett, VA 23870**

**S. SEMLALI, RN**
**Individually and as a Registered Nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

      **SERVE AT:   24414 Musselwhite Drive,**
                    **Waverly, Virginia 23891**

**NURSE BULLS**
**Individually and as a Nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

      **SERVE AT:   24414 Musselwhite Drive,**
                    **Waverly, Virginia 23891**

**DR. S. PATEL**
**Individually and as a Medical Doctor for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

      **SERVE AT:   24414 Musselwhite Drive,**
                    **Waverly, Virginia 23891**

**D. WALKER, RN**
**Individually and as a Registered Nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

      **SERVE AT:   24414 Musselwhite Drive,**
                    **Waverly, Virginia 23891**

**TRACIE SEWARD**
**Individually and as a medical professional for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

      **SERVE AT:   24414 Musselwhite Drive,**
                    **Waverly, Virginia 23891**

**JODI A. GANOE, RN**
**Individually and as a registered nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**C. ALLEN, RN**
**Individually and as a registered nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**BALDWIN, RN**
**Individually and as a registered nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**A. JACKSON**
**Individually and as a medical professional for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**J. ELLIS, RN**
**Individually and as a registered nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**J. SMITH, RN**
**Individually and as a Registered Nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**M. SYES, RN**
**Individually and as a registered nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

          **SERVE AT:   24414 Musselwhite Drive,**
                      **Waverly, Virginia 23891**

**ETHEL H. WILLIAMS, RN**

4

**Individually and as a registered nurse for Sussex I State Prison, the Virginia Department of Corrections, and Armor Correctional Health Services,**

> SERVE AT:  24414 Musselwhite Drive,
> Waverly, Virginia 23891

> *Defendants.*

**COMPLAINT**

COMES NOW Plaintiff SHARON DALLAS, administratrix of the estate of CHARLES DUYNES, Deceased, by counsel, pursuant to Virginia Code § 8.01-50 et. seq., 42 U.S.C. § 1983, and Virginia statutory and common law, and moves this Court for judgment against the defendants, jointly and severally; and in support of her Complaint, states as follows:

**I.    PARTIES**

1. At all relevant times, Plaintiff SHARON DALLAS, was a citizen and resident of Norfolk, Virginia.  Plaintiff is the mother of the decedent, Charles Duynes ("the decedent"), and has qualified in the Norfolk Circuit Court as the administratorix of the decedent's estate.  (Ex. A.) The plaintiff brings suit in her representative capacity on the behalf of the decedent's children as the statutory beneficiaries: Aryonna Duynes, Zaquan Stith, Azayah Palmer, Javil Painter, Adasia Butts, and Antonio Forrest.

2. At all relevant times, the decedent was in the custody and control of the VIRGINIA DEPARTMENT OF CORRECTIONS; Sussex I State Prison; various corrections officers in Sussex I State Prison; and various nurses and/or employees of ARMOR CORRECTIONAL HEALTH SERVICES, INC., all of whom were on duty, and acting within the scope of their employment, and whom were responsible for the decedent's health, welfare, and well-being during his time in custody at Sussex I State Prison through the time of his death at the prison on June 2, 2019.

3. The VIRGINIA DEPARTMENT OF CORRECTIONS ("VDOC") is the executive agency

5

responsible for operating and maintaining correctional facilities within Virginia. Defendant

VDOC provides supervision and control over state correctional facilities and their programs.

Defendant VDOC is responsible for issuing regulations, policies, directives, and operating

procedures governing the operation of state correctional facilities. Defendant VDOC is

statutorily required to establish and maintain a clinical treatment program for certain prisoners

within its custody, including clinical assessments of the prisoners and the development of

appropriate treatment plans. Defendant VDOC has its regular place of business in Richmond,

Virginia.

4. At all relevant times, HAROLD CLARK was the Director for the Virginia Department of

Corrections. Defendant Clarke's regular place of business is a VDOC headquarters in

Richmond, Virginia. He is sued in his individual and official capacity.

5. At all relevant times, Defendants BETH CABELL, OFFICER HUNTER, OFFICER

MISS, SERGEANT CRAFT, OFFICER MORRIS, SERGEANT NOVA, CAPTAIN JOHNSON,

and OFFICER LOCKHART (collectively, "on-duty corrections officers") were employed with

the VDOC and Sussex I State Prison, were on-duty, were acting within the scope of their

employment, and were responsible for the decedent during the decedent's time in custody in the

Sussex I State Prison, and specifically during the several months in which the decedent's medical

condition deteriorated until his ultimate death.

6. At all relevant times, Defendant BETH CABELL was the Warden for the Sussex I State

Prison. As Warden, Cabell had ultimate responsibility for the care and custody of prisoners at

the facility, including the decedent.

7. Upon information and belief, the following Director, Warden, Captain and Sergeants were

employed by the VDOC, were on-duty during the decedent's incarceration, and specifically

during the several months in which the decedent's medical condition deteriorated to his untimely death, and were in supervisory positions over the named defendant officers and medical staff; and entrusted with the legal duty to see that the decedent received all constitutionally mandated medical care and monitoring.  These individuals include, but are not necessarily limited to, HAROLD CLARKE, BETH CABELL, CAPTAIN JOHNSON, SERGEANT CRAFT, and SERGEANT NOVA.

8. All of the said named VDOC employees were duly appointed and actively employed with the VDOC and Sussex I State Prison, and acting within the scope of their employment, agency, and servitude with the VDOC and Sussex I State Prison.

9. Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR CORRECTIONAL") is a Corporation Company under the laws of the State of Florida and licensed to do business in the Commonwealth of Virginia.

10. Upon information and belief, ARMOR CORRECTIONAL entered into a written contract with the VDOC and Sussex I State Prison to provide medical care to the inmates incarcerated at Sussex I State Prison.

11. At all times relevant to this Complaint, Defendants BENJAMIN ULEP, MICHAEL PICIO, S. SEMLALI, BULLS, S. PATEL, D. WALKER, TRACIE SEWARD, JODI A. GANOE, C. ALLEN, BALDWIN, A. JACKSON, J. ELLIS, J. SMITH, M. SYES, and ETHEL H. WILLIAMS (collectively on-duty medical personnel), were duly appointed and actively employed as doctors, nurses, licensed practitioners, and/or trained medical personnel, each acting within the scope of their employment, agency, and servitude for ARMOR CORRECTIONAL, Sussex I State Prison, and the VDOC.  The aforementioned defendants will be referred to collectively herein as the "medical personnel."

12. The attached documents list signatures of individuals whom are/were employed in a medical capacity for defendant ARMOR CORRECTIONAL or other named defendants. (Ex. B) At all times relevant hereto, these individuals acted within the scope of their employment and under color of state law. These individuals remain unknown to the plaintiff due to the illegible handwriting in the documents produced by the VDOC. Plaintiff believes these individuals are liable to him for all these reasons set out herein. References to "medical personnel" collectively will include these individuals.

13. All named defendants HAROLD CLARKE, BETH CABELL, SERGEANT CRAFT, SERGEANT NOVA, CAPTAIN JOHNSON, BENJAMIN ULEP, MICHAEL PICIO, S. PATEL, and J. ELLIS are liable under state law for the constitutional acts or omissions occurring at Sussex I State Prison under the theory of supervisory liability. The aforementioned defendants are subject to supervisory liability under the Virginia wrongful death statute § 8.1-50 and under 42 U.S.C. § 1983 due to their supervisory indifference and/or tacit authorization the misconduct of his subordinates as specifically set out herein.

14. ARMOR CORRECTIONAL is liable under state law for the acts and omissions of its staff under the theory of *respondeat superior*, as set out herein.

15. The VDOC is liable under state law for the acts and omissions of its staff under the theory of *respondeat superior*, as set out herein.

16. At all times relevant to this Complaint, the defendants acted pursuant to and under the color of state law, and pursuant to their authority as correctional personnel and medical personnel. The plaintiff sues all defendants in both their individual and their official capacities.

17. This claim is being brought pursuant to 42 U.S.C. § 1983, the Virginia Wrongful Death Statute, Va. Code § 8.01-50 et. seq., and Virginia common and statutory law. The allegations

and factual contentions contained herein are likely to have further evidentiary support following

a reasonable opportunity for further investigation or during the litigation's discovery process.

## II.   JURISDICTION

18. Jurisdiction exists in this case pursuant to the Eighth Amendment and Fourteenth

Amendments to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. 1331 and

1343.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over

the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 et seq., or,

alternatively, pursuant to Virginia Code § 8.01-25 et seq.  All relief available under the foregoing

statutes is sought herein by the plaintiff.

## III.   VENUE

19. Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts

and omissions giving rise to the plaintiff's claims occurred in this district.

20. Assignment to the Richmond Division of the Eastern District of Virginia is proper

pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part

of the acts and omissions giving rise to the plaintiff's claims occurred in this division.

## IV.   FACTUAL BACKGROUND

21. On or about April 26, 2011, the decedent was transferred to the custody of the VDOC.

He was 30 years old.  The intake physical showed the decedent to be of general good health, with

only a dental issue.

22. On or about February 13, 2013, the decedent was transferred to Sussex I State Prison.

Upon his transfer, the records indicate that the decedent's only health issue was back pain.

### A. On October 16, 2018, Defendant Walker recorded the decedent's complaints of stomach pain for the first time.

23. On or about October 16, 2018, the decedent began to complain of stomach pain to Nurse

9

D. Walker.  The records indicate that the decedent told Nurse Walker that eating, walking, and lying down caused him pain, and that his cramping was so intense that he would have to "ball up" in an attempt to deal with the pain.  The decedent noted excessive sweating all over and listed pain at a 10 on a scale of 1 to 10, with 10 being the most severe.  A physical examination by Nurse Walker noted tenderness in the right upper quadrant of his abdomen.  Following her examination, Nurse Walker prescribed Mylanta, and noted that the decedent needed to be seen by a "provider."  The encounter was recorded in the decedent's jail records and accessible to all named defendants.

24. Upon information and belief, Nurse Walker's notes of her October 16, 2018 encounter with the decedent were given to Dr. Michael Picio.  Dr. Picio reviewed the records, noting that the decedent presented with persistent, intermittent right upper quadrant abdominal pain, and epigastric tenderness to palpation.  Again, the October 16, 2018 encounter was recorded in the decedent's jail records and accessible to all named defendants.  Neither Nurse Walker nor Dr. Picio ordered any diagnostic testing to determine the cause of the decedent's excruciating pain.

**B.  Dr. Picio examined the decedent on October 22, 2018**.

25. Upon information and belief, on October 22, 2018, Dr. Picio examined the decedent.  The decedent complained of right upper quadrant abdominal pain.  Dr. Picio failed to order any diagnostic testing or imaging, and misdiagnosed the decedent with indigestion.

**C.  On December 7, 2018, the decedent submitted an emergency written grievance begging for help for his excruciating abdominal pain.**

26. On or about December 7, 2018, the decedent submitted an emergency written grievance stating: "I have been experiencing extreme abdominal pain! This pain has been a recurring problem.  Right now for the past few hours I've been experiencing excruciating pain on my right hand side.  I need medical attention immediately."  (Ex. C.)  Corrections Officer Lockhart

reportedly received the grievance on December 8, 2018 at 2:13 a.m.  Defendant Ethel H.
Williams reportedly submitted a sick call request in response.

### D.  On December 8, 2018, the decedent sent a JPAY message begging family members on the outside of the prison to help him get medical attention.

27. At 8:46 a.m. on December 8, 2018, the decedent sent a JPAY message to a family
member, stating that he continued to experience intense stomach pain, and asking said person to
call the prison officials to advise them of the situation as he did not feel he was receiving
adequate care to treat his medical condition.  (Ex. D.)

### E.  Later on December 8, 2018, Defendant Tracie Steward saw the decedent.

28. Sometime thereafter, on December 8, 2018, Nurse Tracie Steward finally met with the
decedent, who at that time, was complaining of constant abdominal pain, reporting that it felt like
something was tugging in his stomach.  Nurse Seward again noted that a referral for an
examination by a physician was required.  Nurse Seward failed to order or request any additional
diagnostic testing which would have determined the cause of the decedent's pain, nor did Seward
ensure that the decedent was examined by a medical doctor, as was medically warranted.  Nurse
Seward's encounter with the decedent and the decedent's complaints were documented in jail
records and were accessible by all named defendants.

### F.  On December 16, 2018, Defendant C. Allen saw the decedent.

29. On or about December 16, 2018, the decedent complained of continued abdominal
cramping, nausea, and vomiting to Nurse C. Allen.  The decedent described having pain when
eating, noting that the Prilosec was not helping and was causing heartburn.  Nurse Allen
prescribed Simethicone for the decedent's symptoms.  Nurse Allen failed to conduct or
recommend that any diagnostic testing be performed to determine the cause of the decedent's
ongoing symptoms.  Nurse Allen noted this information in jail records, which were accessible to

all named defendants.

**G. On December 18, 2018, the decedent was merely prescribed six months of omeprazole without any diagnostic testing or further evaluation, and without having seen a physician.**

30. Two days later, on or about December 18, 2018, the records indicate that the decedent was prescribed Omeprazole, for 180 days.

31. Upon information and belief, the decedent continued to complain to staff, including the named defendants, and other inmates about his stomach pain and associated symptoms which continued to get worse. All this information was documented in jail records and were available to all defendants.

**H. On January 11, 2019, the decedent returned to the medical defendants with continued complaints of chronic, excruciating symptoms, and told the defendants that the prescribed medication did not help.**

32. On or about January 11, 2019, the decedent was seen for a follow-up examination with Armor Correctional medical personnel. These medical personnel noted that the decedent's chronic complaints were misdiagnosed as irritable bowel and hypertension. The decedent continued to complain of abdominal pain and cramping, telling the medical personnel that Prilosec did not help his symptoms. Thereafter, the medical personnel prescribed Bentyl and HCTZ. This encounter and the decedent's complaints were documented in jail records and were accessible to all named defendants. Once again, the identified medical personnel failed to correctly diagnose, treat, or order any diagnostic testing which would have assisted them in correctly diagnosing the cause of the decedent's chronic abdominal pain and symptoms, which would have allowed them to have successfully treated him.

**I. On January 27, 2019, the decedent submitted an offender request to be evaluated by a physician.**

33. On or about January 27, 2019, and despite multiple defendants having noted that the

decedent should be evaluated and treated by a medical doctor, the named defendants continued to deny decedent access to a doctor for purposes of examining and treating his deteriorating medical condition.  The decedent submitted an offender request to be physically examined by a doctor on January 27, 2019.  The decedent noted that he needed to be examined by a doctor as his stomach pain was "still doing the same thing" and that he continued to experience extreme pain that was not being adequately addressed.  (Ex. E.)  Defendants failed to act upon this request until February 4, 2019, when Nurse D. Walker noted that the decedent was scheduled for an appointment.  The decedent had been complaining of stomach pain and associated symptoms for three (3) months at this point.

**J.  On January 28, 2019, the decedent sent another JPAY message begging family members on the outside of the jail to advocate for the defendants to provide medical attention and treatment for his ongoing, excruciating pain.**

34. Again, at approximately 9:25 a.m. on January 28, 2019, the decedent sent a JPAY message to a family member requesting that she call the prison to intervene and get the defendants to provide the necessary medical treatment to diagnose and treat his worsening condition.  The decedent explained that he had "crazy pain" in his stomach the night before and that he began to vomit from his nose.  (Ex. F.)

**K.  On January 28, 2019, Defendant Dr. Patel acknowledged that the decedent's laboratory testing results were abnormal.**

35. On or about January 28, 2019, the decedent received a note, purportedly from Dr. Patel, stating that decedent's labs were abnormal.  The document further noted that the decedent was to be examined during his next chronic care clinic visit.  The record is silent as to whether Dr. Patel physically examined decedent in an attempt to treat or diagnose the decedent's worsening medical condition.

13

**L.  On February 5, 2019, the decedent filed another written grievance begging for medical treatment for his chronic symptoms, and notifying all defendants that he was not receiving adequate medical evaluation and treatment.**

36. On or about February 5, 2019, the decedent filed yet another grievance with the VDOC stating "Look, I need to be seen by a [sic] outside doctor or hospital [sic] its something wrong with my stomach and this prison is not willing to help me with [sic].  I have been in pain for some months now.  I let them know my stomach hurt [sic] they put me on blood pressure pills." (Ex. G.)  The request was reportedly sent to the medical unit on February 5, 2019.

**M.  On February 6, 2019, the decedent complained to Defendant D. Walker of ongoing pain and progressing symptoms.**

37. On or about February 6, 2019, the decedent complained to Nurse D. Walker of continued and ongoing stomach pain which he suffered for over one year.  The decedent described constant, cramping pain in his right upper quadrant and extending into his lower quadrant.  The decedent reported associated vomiting.  Nurse Walker noted that the decedent's bowel sounds were decreased.  The decedent explained to Nurse Walker that he could only eat fish and rice because all other food caused his stomach pain and discomfort to become worse.  Nurse Walker noted that they were waiting on results from bloodwork on January 2019, and that the decedent's lab work was abnormal.  Nurse Walker again documented decedent's need to be physically examined by a medical doctor.  The records from Nurse Walker's examination of the decedent were reviewed by Nurse Jodi A. Ganoe and Nurse C. Allen, and were accessible to all named defendants.  No defendant requested, nor attempted to order any diagnostic testing to determine the cause of the decedent's deteriorating medical condition, a condition which was readily diagnosable and treatable if proper medical procedures had been implemented.

**N.  On February 12, 2019, Defendant A. Jackson saw the decedent for complaints of ongoing stomach pain and abnormal lab results.**

14

38. On or about February 12, 2019, the decedent followed up with Nurse A. Jackson for his continued stomach pain and to review his abnormal lab results, with the decedent now reporting epigastric discomfort and gas, in addition to his chronic pain.  The decedent again told the defendants that the prescribed Prilosec did not relieve his pain nor associated symptoms.  Nurse Jackson again noted that the decedent needed to be examined by a medical doctor.  The records reflect that Nurse Baldwin reviewed the notes from Nurse Jackson's encounter with the decedent, which were accessible to all named defendants.  Nurse Jackson, nor any defendant, ordered or conducted any diagnostic testing to determine the cause of the decedent's deteriorating condition.

**O. The decedent's serious medical condition deteriorated for months without access to evaluation by a physician or any diagnostic testing, and without any medical treatment beyond medications intended to alleviate the symptoms.**

39. On or about April 12, 2019, the records indicate that the decedent was prescribed dicyclomine, ranitidine, Gaviscon foam tab chews, and HCTZ for 180 days (6 months).

**P. On June 1, 2019, the decedent's deteriorating medical condition rendered him all but totally debilitated.  The seriousness of the medical condition was open and obvious to all those who observed him.**

40. Thereafter, the record reflects that during the morning hours of June 1, 2019, fellow inmates helped the decedent down the stairs from his cell.  The decedent was in tears due to extreme stomach pains—clear and obvious worsening of pain and associated symptoms he had been complaining of since at least October 16, 2018.  The decedent was unable to stand or ambulate without assistance.  Upon information and belief, Corrections Officer Morris was assigned to the cell block and notified his supervisor, Sergeant Craft, that the decedent was throwing up blood.  Sergeant Craft failed to respond to the existing emergency.  Corrections Officer Morris eventually opened the automatic door, permitting several inmates to assist the

decedent to the medical unit, given that he was unable to ambulate on his own due to his obvious, serious, and quickly deteriorating medical condition which was quickly becoming more life threatening.

41. At approximately 10:45 a.m., an inmate assisted the decedent into the medical unit because the decedent was unable to walk. The decedent was placed in a wheel chair. The decedent was crying due to his abdominal pain, and was literally begging the corrections officers and medical personnel for help.

> **Q. Defendant S. Semlali saw the decedent on June 1, 2019, after fellow inmates and corrections staff saw the decedent's obvious signs and symptoms of his serious medical condition, which remained obvious, improperly treated, and misdiagnosed.**

42. The decedent complained to Nurse S. Semlali of nausea, vomiting, and pain rated at an 8 out of 10. **The decedent carried a large bag of liquid to medical, which tested positive for blood. The decedent explained that he vomited up the liquid.** Incredibly, Nurse Semlali, despite knowledge of the decedent's complete history, as setout herein, and the decedent's then existing complaints, told the decedent that nothing was wrong. The decedent threw himself on the floor in a "last-gasp" attempt to get the Armor Correctional medical professionals to properly and finally take his complaints seriously, and get him the proper medical treatment that they were constitutionally mandated to provide. Contrary to that duty, Nurse Semlali continued to berate the decedent, telling him that nothing was wrong with him, without any medical or factual basis for the opinions she was stating. Nurse Semlali failed to assist the decedent in any medical capacity whatsoever and failed to conduct any diagnostic testing or examination, and rather again provided the decedent with over-the-counter medications, to include Emetrol, Tylenol, and Pepto Bismol, all that had failed to provide any relief in the past. Nurse Semlali told the decedent to drink at least 8 ounces of water a day and sent him back to his cell. Nurse Semlali further

16

refused to treat the decedent and refused to send him to a hospital where he could receive the proper care his condition demanded.  Nurse Semlali's notes from this encounter were documented in jail records and accessible to all named defendants.

**R.  Defendant Semlali sent the decedent back to his cell in an incapacitated state.**

43. Recognizing the obvious medical emergency which then existed, fellow inmates helped the decedent back to the cell block by wheel chair because the decedent was unable to walk.  The inmates lifted the decedent out of a wheel chair to get him back into the cell block because the decedent was physically unable to get out of the chair on his own.  Inmates then made complaints to the on-duty corrections officers, which was clearly warranted, about Nurse Somlali's failure to treat or facilitate care for the decedent.  The inmates told the corrections officers that Nurse Semlali sent the decedent back to his cell block without checking on him or looking at him.  While inmates reported Nurse Semlali's callous and reprehensible behavior to the corrections officers then on duty, **the decedent was reportedly lying on the floor, crying, and spitting up blood**, pleading with the corrections officers and medical personnel to get him to the hospital immediately.  Sergeant Craft reported his concerns to Nurse Semlali in medical, who all but ignored the pleas of the decedent, fellow inmates, and correctional staff.  **The present and on-duty named corrections officers and medical personnel then ignored the decedent's condition for several hours, as the decedent continued to spit up blood, cry, and writhe in pain**.  After several hours, a corrections officer finally notified Sergeant Craft that the decedent was still laying on the floor spitting up blood.  A group of prisoners again started to voice their complaints and objections again about Nurse Semlali, calling her "racist" for refusing to assist the decedent.  Other inmates and one corrections officer eventually helped the decedent back over to the medical unit later that day.

**S.  After several hours of the defendant experiencing excruciating and debilitating symptoms, Defendant Semlali saw the decedent again later on June 1, 2019.**

44. At approximately 3:34 p.m. on June 1, 2019, the decedent returned to the medical unit via wheel chair complaining of nausea, vomiting, and stomach pain rated at an 8 out of 10.  The decedent was sweating and nauseous.  **The decedent was carrying another bag of liquid containing his vomit**.  Nurse Semlali notified Dr. Ulep.  Nurse Semlali kept the decedent in the medical unit for observation and administered Phenergan to treat symptoms of nausea and vomiting.  Neither Nurse Semlali, Dr. Ulep, nor any other medical personnel conduct any examination or diagnostic testing to determine the cause of the decedent's symptoms, nor did they attempt to bring the decedent to the emergency room which the circumstances warranted, despite the pleas of inmates and the decedent to do so.

45. At approximately 5:40 p.m. on June 1, 2019, Nurse Semlali noted that the decedent was lying in bed.  The decedent told Nurse Semlali that he vomited twice.  The decedent refused food and drink.

**T.  Defendant M. Syes saw the decedent on multiple occasions during the late-night hours of June 1, 2019 and early morning hours of June 2, 2019.**

46. At approximately 11:26 p.m. on June 1, 2019, the decedent reported another episode of vomiting and continued abdominal pain to on-duty medical personnel.  It is not known whether Nurse Samlali personally notified oncoming duty Nurse Syes about the decedent's medical emergency, but Nurse Syes was aware of the decedent's condition based upon the decedent's medical records and her personal observations.  Nurse M. Syes noted that the decedent's stomach was tender to touch.  The decedent described belching and flatulence with pain rated at an 8 out of 10.  Ms. M. Syes provided the decedent with Tylenol.  Nurse Syes made no attempts to diagnose the cause of the decedent's symptoms nor facilitate emergency medical treatment.

47. At approximately 1:36 a.m. on June 2, 2019, Nurse Syes noted that the decedent was lying on his bed with a towel over his eyes.  The decedent was unable to be awakened.

48. At approximately 3:15 a.m. on June 2, 2019, the decedent complained to Nurse Syes of increased abdominal pain **rated at a 10 out of 10**.  The decedent told Nurse Syes of **another episode of vomiting**.  Nurse Syes noted that **the decedent was noticeably uncomfortable, shifting weight, closing his eyes even when speaking, holding his abdomen, and appeared agitated easily**.  Nurse Syes provided the decedent with medications including Bentyl, Tylenol, and Phenergan, none of which had alleviated the decedent's symptoms in the past.

> **U. Nearly six hours after her first documenting her interaction with the decedent, Defendant Syes finally notified a medical doctor of the decedent's deteriorating condition.**

49. Nurse Syes, despite the passage of almost 24 hours, in which the decedent was suffering, failed to notify a medical doctor of the decedent's medical emergency until 5:00 a.m. on June 2, 2019.  Nurse Syes noted that the decedent's abdomen was tender to touch with a reported pain level of 10 out of 10.  The decedent told Nurse Syes that he continued to be nauseous and could not have a bowel movement even though he tried.  Upon being advised of the decedent's symptoms, a medical doctor immediately recommended that he be transported to MCV Emergency Room via a security van.  Nurse Syes notified the watch commander of this order at 5:10 a.m. on June 2, 2019.

> **V. Even after it was recommended that the decedent be transported to the emergency room, the defendants waited in excess of 5 more hours before he was to be transported to a hospital.**

50. At approximately 7:55 a.m. on June 2, 2019, after the passage of an additional 3 hours from the time a medical doctor ordered that the decedent to be transported to the emergency room, and after an entire day following the decedent's appearance in the medical unit with a bag

19

of vomited blood, did the medical personnel contact the watch commander to inquire about the time of the decedent's departure to the emergency room. The watch commander reportedly stated that he was working to put security staff in place for the transport.

51. At approximately 9:00 a.m. on June 2, 2019, Nurse S. Semlali noted that the decedent's abdomen was tender to touch. Nurse Semlali further noted that the decedent continued to vomit a light brown liquid that morning.

52. At approximately 9:16 a.m. on June 2, 2019, Nurse Semlali reportedly spoke with Captain Johnson regarding the transport of the decedent to the emergency room. The watch commander again reported that a team was being put together.

53. At approximately 9:53 a.m. on June 2, 2019, the decedent was transported by Nurse Semlali to the sally port for transport the emergency room.

**W. Five hours after a medical doctor recommended that the decedent be transported to the emergency room, the decedent went unresponsive.**

54. At approximately 10:30 a.m. on June 2, 2019, 24 hours after the decedent first went to the medical unit with a bag of bloody vomit and abdominal pain and nearly 8 months after the decedent first reported abdominal pain to medical personnel and corrections staff at Sussex I, Nurse Semlali reportedly received a call from the sally port that the decedent was unresponsive.

55. At approximately 10:35 a.m., Nurse Semlali arrived in the sally port to find the decedent sitting in a wheel chair. The decedent was shaking. Nurse Semlali asked the decedent if he was okay. The decedent did not respond. At approximately 10:40 a.m., Nurse Semlali moved the decedent to the floor, applied AED, and began CPR. Nurse Semlali reportedly asked security to call 911. EMT's arrived responsive to the 911 call at approximately 10:55 a.m. EMT's reportedly continued CPR, administered Epi and Narcan, and intubated the decedent.

**X. The decedent died at 11:11 a.m. on June 2, 2019.**

56. EMTs called Dr. Clark at Southside Regional Medical Center at 11:11 a.m.  Dr. Clark advised EMTs to stop CPR and called time of death at 11:11 a.m.

**Y.  On or about July 24, 2019, a medical examiner determined that the decedent's cause of death was hemorrhagic pancreatitis due to obstructive cholelithiasis and cholecystitis.**

57. Dr. Jennifer Bowers, licensed medical examiner for the Commonwealth of Virginia, determined that the cause of the decedent's death was **hemorrhagic pancreatitis due to obstructive cholelithiasis and cholecystitis**.  In laymen's terms, the decedent died due to **gall stones, a medical condition that should have been easily diagnosed and was completely treatable**.

58. The plaintiff called the prison on several occasions over the eight months or more during which the decedent suffered in the defendants' custody.  She spoke with on-duty corrections officers and on-duty medical personnel and advised that her son required immediate medical attention.  In spite of all of the information known to them, the defendants failed to take the necessary steps to provide the decedent with the medical treatment mandated by federal and Virginia law, and necessary to save the decedent's life.

59. Defendants were legally required to coordinate, facilitate, and provide medical evaluation and testing, including diagnostic testing, given the decedent's known deteriorating state.

60.  All of the named defendants were on-duty and tasked with maintaining the health and welfare of the inmates in custody of Sussex I State Prison, and specifically the decedent, at the time of the subject unconstitutional acts and/or omissions.

61. All of the named on-duty corrections officers, including Officer Hunter, Officer Miss, Sergeant Craft, Officer Morris, Sergeant Nova, Captain Johnson, and Officer Lockhart were on-

duty during the time period at the subject of this Complaint, were aware of the decedent's

decedent's deteriorating medical condition, were aware that the decedent was not being provided

access to necessary medical care, and by either act or omission failed to provide the decedent

with the medical care necessary to save the decedent's life, in violation of federal and Virginia

law.

62. All of the named on-duty medical personnel, including Benjamin Ulep, Michael Picio, S.

Semlali, Nurse Bulls, S. Patel, D. Walker, Tracie Seward, Jodi Ganoe, C. Allen, Nurse Baldwin,

A. Jackson, J. Ellis, J. Smith, M. Syes, Ethel H. Williams—as well as those individuals named in

the attached medical records referenced in paragraph 12 of this Complaint—were on-duty during

the time period at the subject of this Complaint, were aware of the decedent's decedent's

deteriorating medical condition, were aware that the decedent was not being provided access to

necessary medical care, and by either act or omission failed to provide the decedent with the

medical care necessary to save the decedent's life, in violation of federal and Virginia law.

**V.    COUNT 1: WRONGFUL DEATH: ON-DUTY CORRECTIONS OFFICERS' NEGLIGENCE**

63. Paragraphs 1 through 62 are incorporated by reference herein.

64. At all relevant times, the on-duty corrections officers were engaged in duties of operation

of the prison and had a duty to exercise reasonable care in their treatment of the decedent.

65. Each of the named defendants herein, through their acts and/or omissions as set out

herein, violated public policy, procedures, and standards, as well as the Prison's written policies

and procedures in place to ensure the health and well-being of its inmates while incarcerated.

66. At all relevant times, and especially from at least October 2018 until the decedent's

untimely death, on-duty officers should have known that the decedent was suffering from a

serious medical condition requiring prompt medical evaluation and diagnostic testing.

67. Notwithstanding their duties, the defendants breached the standard of care when they:

    a.  Negligently failed to facilitate appropriate medical attention for the decedent as he suffered nausea, vomiting, and excruciating stomach pains for months;

    b.  Negligently failed to appropriately monitor the decedent while he suffered from concerning medical symptoms;

    c.  Negligently failed to provide the decedent with the appropriate medical evaluation(s), treatment, and diagnoses, as indicated by his appearance and documented by frequent grievance forms and medical treatment request forms as well as notes made by medical defendants;

    d.  Negligently failed to provide the decedent proper medical evaluation(s) and diagnostic testing for his obvious and serious symptoms, including abdominal pain, nausea, vomiting blood, and sweating;

    e.  Negligently failed to facilitate prompt transport to the hospital emergency room based upon the decedent's obvious serious medical condition, and even after it was ordered by a medical doctor;

    f.  Negligently failed to take all reasonable and necessary steps to prevent the decedent's death;

    g.  Negligently failed to diagnosis and treat an otherwise benign medical condition that was treatable and non life-threatening if properly treated.

68. The acts and/or omissions as set out herein as to the on-duty corrections officers were undertaken in the course of their employment with the VDOC and Sussex I State Prison.

69. Each of the named defendants herein, through their acts and/or omissions as set out herein, violated public policy, procedures, and standards of care developed to ensure the health

and well-being of its inmates while incarcerated, as required by the United States Constitution and Virginia law.

70. As a direct and proximate result of the on-duty corrections officers' omissions and negligence, the decedent died on June 2, 2019, without any medical treatment or diagnostic testing having been administered.

71. As a further direct and proximate result of the negligence and gross disregard for the decedent's medical condition, Defendants, jointly and severally, caused the decedent to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, in the months leading up to the decedent's untimely death.

## VI.    COUNT II: ON-DUTY CORRECTIONS OFFICERS' GROSS NEGLIGENCE

72. Paragraphs 1 through 71 are incorporated by reference herein.

73.   The conduct of the on-duty corrections officers, as set out above, was grossly negligent, willful, and reckless in that the on-duty corrections officers were aware that the decedent was complaining of severe stomach pain, was vomiting blood, was unable to walk, was nauseous, was lying on the floor, and was begging for medical help, and completely ignored the obvious serious medical condition before them, completely failing to ensure that the decedent received proper medical evaluations, monitoring, diagnostic testing, and treatment.

74. The acts and/or omissions as set out herein, as to the on-duty officers, were undertaken in the course of their employment with the VDOC and Sussex I State Prison.

75.   Each of the named defendants herein, through their acts and/or omissions as set out herein, violated public policy, procedures, and standards of care developed to ensure the health and well-being of its inmates while incarcerated, as required by the United States Constitution and Virginia law.

76. As a direct and proximate result of the defendants' gross negligence, the decedent died on June 2, 2019.

77. As a further direct and proximate result of the defendants' gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, for the months leading up to the decedent's untimely death.

## VII.   COUNT III: ON-DUTY CORRECTIONS OFFICERS' § 1983 VIOLATIONS – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

78. Paragraphs 1 through 77 are incorporated by reference herein.

79. At the time of the events giving rise to this litigation, the on-duty guards were acting in their individual capacities, as employees of the VDOC and Sussex I State Prison, and under the color of state law.

80. As discussed herein, the decedent had an obvious serious medical need, which was obvious to everyone who encountered him, including the named defendants.

81. The conduct of the on-duty corrections officers, as set out above, in ignoring the decedent's complaints, pleas, and obvious serious medical condition, shows their deliberate indifference to the decedent's mental and physical health needs, including a failure to evaluate, monitor, and treat the decedent's serious medical needs during his confinement.  The on-duty corrections officers failed to facilitate any diagnostic testing and medical treatment, even after it was brought to their attention that the on-duty medical personnel were not providing the decedent with any treatment, and in doing so, violated the restriction on cruel and unusual punishment provided by the Eighth and Fourteenth Amendment of the United States Constitution.

82. The acts and/or omissions as set out herein as to the on-duty officers were committed in the course of their employment with the VDOC and Sussex I State Prison.

25

83. As a direct and proximate result of the defendants' deliberate indifference to serious medical need, the decedent died on June 2, 2019.

84. As a further direct and proximate result of the defendants' deliberate indifference, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, during the months leadings up to the decedent's untimely death.

85. The supervisory defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of the decedent's constitutional rights.  The plaintiff is therefore entitled to recover punitive damages.

86. The on-duty defendants' violations of Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for relief including compensatory damages, punitive damages, attorney's fees, and costs to the estate.

**VIII.**    **COUNT VI: DIRECTOR HAROLD CLARKE, LEAD WARDEN BETH CABELL, SERGEANT CRAFT, SERGEANT NOVA, CAPTAIN JOHNSON, DR. PATEL, DR. ULEP, DR. PICIO, AND J. ELLIS'S § 1983 VIOLATIONS: DELIBERATE INDIFFERENCE – SUPERVISORY LIABILITY**

87. Paragraphs 1 through 86 are incorporated by reference herein.

88. At all relevant times, through their actions and omissions set forth above, and while acting under color of state law, and in their individual capacities, Defendants Clarke, Cabell, Craft, Nova, Johnson, Patel, Ulep, Picio, and Ellis (the "supervisory defendants), acted in a manner that was deliberately indifference to the decedent's Eighth and Fourteenth Amendment rights.

89. The supervisory defendants had actual knowledge that their subordinates, including, but not limited to, individual named defendants in this matter, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the decedent.

90. As noted above, the decedent complained of pain and serious symptoms for 8 months.

26

During that time, he begged for medical help by filing several grievances and by requesting that his family members call the prison to advocate on his behalf.  Upon information and belief, fellow inmates reported that the decedent was being denied medical treatment to the supervisory defendants.  This information was documented in the jail records.  Clarke, Cabell, Craft, Nova, and Johnson were therefore, aware that the decedent had serious, ongoing symptoms that were being left undiagnosed and untreated.

91. The decedent personally complained of the issues to staff in the medical unit, which was documented in the decedent's medical records.  These medical records were reviewed by Dr. Patel, Dr. Ulep, and Dr. Picio.  Patel, Ulep, and Picio were, therefore, aware that the decedent had serious, ongoing symptoms that were being left undiagnosed and untreated.

92. The supervisory defendants' response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices.  The supervisory defendants failed to act on their knowledge, failed to carry out their own obligations to properly supervise their subordinates and/or intervene on the decedent's behalf, and failed to provide the decedent with access to appropriate, timely medical care.

93. There was an affirmative causal link between the supervisory defendants' inaction and the particular constitutional injury suffered by the decedent.  As a result of the supervisory defendants' unconstitutional, deliberate indifference to the needs, circumstances, and requirements for providing medical treatment to inmates, the supervisory defendants allowed the decedent to suffer for 8 months and die a preventable death from a treatable illness.  The decedent suffered a denial of her constitutional rights and severe pain and suffering.  The supervisory defendants' unconstitutional, deliberate indifference to the decedent's circumstances caused his untimely death.

94. The supervisory defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of the decedent's constitutional rights.  The plaintiff is therefore entitled to recover punitive damages.

95. The supervisory defendants' violations of Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for relief including compensatory damages, punitive damages, attorney's fees, and costs to the estate.

IX.   **COUNT VI: DIRECTOR HAROLD CLARKE, LEAD WARDEN BETH CABELL, SERGEANT CRAFT, SERGEANT NOVA, CAPTAIN JOHNSON, DR. PATEL, DR. ULEP, J. ELLIS, AND DR. PICIO'S § 1983 VIOLATIONS: DELIBERATE INDIFFERENCE – FAILURE TO TRAIN, SUPERVISE, AND CONTROL**

96. Paragraphs 1 through 95 are incorporated by reference herein.

97. At all relevant times, the supervisory defendants, including Clarke, Cabell, Craft, Nova, Johnson, Patel, Ulep, Picio, and Ellis, had a duty to properly hire, train, supervise, and fire, if necessary, Virginia Department of Corrections ("VDOC") personnel to ensure that inmates in the custody of Sussex I were provided with constitutionally mandated medical care.

98. The supervisory defendants failed to effectively train, supervise, and control officers under their command regarding the administration of, and procedures for providing access to, medical treatment for inmates housed in the correctional facility.

99. As supported by the facts set out above, the supervisory defendants had a policy, custom, and/or practice of failing to effectively train, supervise, discipline, and control officers under their supervision regarding the appropriate provision of medical care.

100. The supervisory defendants knew or should have known that the defendant officers and medical personnel required adequate training on the proper administration of medical care.

101. The supervisory defendants violated their duty in failing to properly train officers at

28

Sussex I on the proper administration of medical care.

102. In violating their duties, the supervisory defendants demonstrated a deliberate indifference to the need to provide proper training for the defendant officers and medical personnel at Sussex I, especially in light of the repeated grievances filed, family member complaints lodged, and inmate complaints lodged, as set out above.

103. As a direct and proximate result of the supervisory defendant's violation of their duties to properly train officers and medical personnel at Sussex I, the decedent's constitutional rights were violated, he was denied access to medical treatment, and the decedent died on June 2, 2019.

104. The supervisory defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of the decedent's constitutional rights. The plaintiff is therefore entitled to recover punitive damages.

105. The supervisory defendants' violations of Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for relief including compensatory damages, punitive damages, attorney's fees, and costs to the estate.

## X.    COUNT VII: ON-DUTY MEDICAL PERSONNEL'S NEGLIGENCE

106. Paragraphs 1 through 105 are incorporated by reference herein.

107. At all relevant times, the on-duty medical personnel had a duty of reasonable care in their treatment of the decedent.

108. Defendant Ellis, as the Health Services Administrator for Sussex I State Prison, had a duty to supervise and train medical personnel employed in the jail and had an individual duty to provide inmates access to medical care.

109. As discussed herein, the decedent had an obvious serious medical need. The symptoms of the serious medical need were open and obvious to anyone who encountered the decedent and

were documented in the prison medical records.  The serious medical need was known and ignored by the medical personnel at the prison.

110. At all relevant times, the on-duty medical personnel should have known that the decedent was in physical distress given the decedent's verbal complaints, the decedent's written complaints, the decedent's abnormal appearance, physical evidence of the decedent vomiting blood, the decedent's inability to walk, and reports from corrections officers of the decedent's deteriorating condition, and failed to ensure that the decedent received proper physical health evaluations, monitoring, diagnostic testing, and treatment.

111. Notwithstanding their duties, the medical staff personnel;

    a.  Negligently failed to identify and take all necessary steps to treat or obtain treatment for the decedent's physical health concerns;

    b.  Negligently failed to monitor the decedent in spite of serious symptoms known to them;

    c.  Negligently failed to request that the decedent be transported to a hospital emergency room for medical evaluation, diagnostic testing, and treatment in a timely manner;

    d.  Negligently failed to follow up to make certain that decedent's condition did not worsen after the decedent was sent back to his cell without medical treatment;

    e.  Negligently failed to respond to reports from corrections officers of the decedent's obvious and serious medical condition; and

    f.  Negligently failed to ensure that the decedent received necessary emergency medical treatment.

112. As a direct and proximate result of the medical personnel's negligence, the decedent

died on June 2, 2019.

113. Each of the acts or omissions of the named medical personnel were committed within the course of their employment with the VDOC, Sussex I State Prison, and Armor Correctional Health Services.

114. As a further direct and proximate result of the negligence of the defendant medical personnel, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, during the months leading to the decedent's untimely death on June 2, 2019.

115. The plaintiff certifies that, pursuant to Virginia Code § 8.01-50.1, he has obtained a written certification from a qualified expert that the on-duty medical personnel and Armor Correctional Health Services' actions deviated from the applicable standard of care and that said deviation was the proximate cause of death of the decedent.

## XI.    COUNT VIII: THE ON-DUTY MEDICAL PERSONNEL'S GROSS NEGLIGENCE

116. Paragraphs 1 through 115 are incorporated by reference herein.

117. The conduct of the on-duty medical personnel, as set out above, was grossly negligent, willful and reckless, in that they knew that the decedent had an obvious and serious need for medical evaluation, diagnostic testing, and treatment.  The medical personnel acted in a grossly negligent fashion by failing to provide necessary and adequate medical treatment, failing to provide timely access to a hospital emergency room, and failing to take any steps, for several months, to prevent the decedent's death.

118. The medical personnel's conduct was clearly in reckless disregard of the rights of the decedent and was designed purely to inflict discomfort, humiliation, embarrassment, and other harm to the decedent.

119. As a direct and proximate result of the defendants' gross negligence, the decedent died on June 2, 2019

120. As a further direct and proximate result of the medical personnel's gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, during the months leading to his untimely death of June 2, 2019.

**XII.** **COUNT IX: ON-DUTY MEDICAL PERSONNEL'S § 1983 VIOLATIONS: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**

121. Paragraphs 1 through 120 are incorporated by reference herein.

122. At the time of the events giving rise to this litigation, the on-duty medical personnel were acting in their individual capacities and as employees of the VDOC, Sussex I State Prison, and Armor Correctional Health Services, and acted under color of state law.

123. Defendant Ellis, as the Health Services Administrator for Sussex I State Prison, had a duty to supervise and train medical personnel employed in the jail.

124. The conduct of the on-duty medical personnel, as set out above, shows their deliberate indifference to the decedent's basic needs during his confinement.  The defendants, as alleged herein, failed to offer basic medical treatment, failed to provide or facilitate any diagnostic testing, failed to monitor the decedent appropriately for worsening symptoms, and failed to promptly transport the decedent to a hospital emergency room before the decedent's untimely death.  The conduct of the defendants offends the standards of basic human decency and violates the Constitutional restriction on cruel and unusual punishment and right to due process.

125. As a direct and proximate result of the defendants' deliberate indifference to a serious medical need, the decedent died on June 2, 2019.

126. As a further direct and proximate result of the medical personnel's gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain,

32

and inconvenience, during the several months leading to the decedent's untimely death of June 2, 2019.

**XIII.   COUNT X: ARMOR CORECTIONAL HEALTH SERVICES' NEGLIGENCE**

127. Paragraphs 1 through 126 are incorporated by reference herein.

128. At all relevant times, Armor Correctional Health Services, individually and through its employees, agents, and servants was engaged in the medical treatment of inmates and had a duty to act with reasonable care in its treatment of the decedent.

129. At all relevant times, Armor Correctional Health Services, individually and through its employees, agents, and servants, had a further duty to establish and enforce policies and procedures to avoid its medical staff personnel's violation of a prisoner's constitutional rights such as the right to due process under the Fifth and Fourteenth Amendment and the right against cruel and unusual punishment prescribed by the Eighth and Fourteenth Amendment.

130. At all relevant times, Armor Correctional Health Services had a duty to train and supervise the employees, agents, and servants, including the defendant medical personnel, and establish policies and procedures to be followed for treatment, supervision, monitoring, diagnostic testing, and transportation to emergency medical facilities for an inmate, such as the decedent, who was demonstrating symptoms of a serious medical condition.

131. Armor Correctional Health Services breached this duty by failing to provide the decedent with medical treatment, adequate monitoring, appropriate diagnostic testing, and access to emergency medical facilities, which demonstrated its callous indifference for the decedent's well-being.

132. As a direct and proximate result of the defendants' negligence, the decedent died on June 2, 2019.

133. As a further direct and proximate result of the medical personnel's negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, during the several months leading to the decedent's untimely death on June 2, 2019.

XIV.    **COUNT XI: ARMOR CORRECTIONAL HEALTH SERVICES' GROSS NEGLIGENCE**

134. Paragraphs 1 through 133 are incorporated by reference herein.

135. Armor Correctional Health Services conduct, as set out above, was grossly negligent, willful, and reckless, in that it, through its employees, agents, and servants, failed to take adequate steps to provide and/or facilitate medical treatment, evaluation, diagnostic testing, and timely access to emergency medical facilities.

136. Armor Correctional Health Services' conduct was in reckless disregard of the rights of the decedent.  Its actions were designed purely to inflict discomfort, humiliation, embarrassment, and other harm to the decedent.

137. Armor Correctional Health Services otherwise acted with gross negligence, depriving the decedent of her rights, privileges, and immunities secured by the United States Constitution or laws of the United States.

138. As a direct and proximate result of the defendants' gross negligence, the decedent died on June 2, 2019.

139. As a further direct and proximate result of the medical personnel's gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, during the several months leading to the decedent's untimely death on June 2, 2019.

XV.    **COUNT XII: PUNITIVE DAMAGES**

140. Paragraphs 1 through 139 are incorporated by reference herein.

141. At all relevant times, the defendants acted with actual malice toward the decedent.

142. Defendants further acted consciously in an unjustifiable, willful, wanton, and reckless disregard of the decedent's rights.  Defendants were aware of their conduct and were also aware from their knowledge of existing circumstances and conditions that their conduct would likely result in physical, mental, financial, emotional injury, and death to the decedent.

143. The defendants either knew, or through the exercise of reasonable care, should have known of the decedent's serious medical need and their failure to respond appropriately to that risk warrants an award of punitive damages.

144. As a further direct and proximate result of the defendants' acts and omissions, the plaintiff, by counsel, demands judgment against the defendants, jointly and severally, for compensatory damages in the amount of **FIVE MILLION DOLLARS ($5,000,000.00)** and punitive damages in the amount of **TEN MILLION DOLLARS ($10,000,000.00),** plus all costs and interest as permitted by law.

SHARON DALLAS, Administratrix of the Estate of
CHARLES DUYNES, deceased

By: _____/s/_____

Katherine M. Lennon, Esquire (VSB No. 92358)
Edward Fiorella, Jr., Esquire (VSB No. 26176)
***Fraim & Fiorella, P.C.***
Town Point Center, Suite 601
150 Boush Street
Norfolk, Virginia 23510
(757) 227-5900
(757) 227-5901 (fax)
klennon@ff-legal.com
efiorella@ff-legal.com
Counsel of Record for the Plaintiff

35