IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SHARON DALLAS, *as Administrator of the*
*Estate of Charles Duynes, THE DECEDENT, deceased*,
    Plaintiff,

v.                                       Civil No. 3:21cv349 (DJN)

SERGEANT CRAFT, *et al.*,
    Defendants.

## **MEMORANDUM OPINION**

Plaintiff Sharon Dallas,[1] administratrix of the Estate of Charles Duynes, deceased

("Duynes" or "the decedent"), brings this action against Defendants Sergeant Craft, Corrections

Officer Moss, Sergeant Norris, and Captain Johnson (employees of the Virginia Department of

Corrections and collectively, the "VDOC Defendants"), Armor Correctional Health Services,

Inc. (sued as "Armor Correctional Health Services" and hereinafter, "Armor"), Benjamin Ulep,

M.D. ("Dr. Ulep"), Tracie Seward R.N., Shirley Abouhassoun-Semlali R.N., and Crystal Allen

R.N. (Nurses Seward, Semlali, and Allen, respectively, and, collectively and together with Dr.

Ulep and Armor, the "Armor Defendants"), Dawnte Walker, R.N. (sued as "D. Walker, RN")

and Makeshia Sykes, R.N. (referred to respectively as "Nurse Walker" and "Nurse Sykes"),

Michael Picio, D.O. ("Dr. Picio"), Dr. S. Patel and Ayanna Jackson, alleging violations of the

Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983

("Section 1983"), the Virginia Wrongful Death Statute, Va. Code § 8.01-50 *et seq.*, the Virginia

---

[1]    Plaintiff, the mother of Duynes, brings suit in her representative capacity on behalf of his children as the statutory beneficiaries: Aryonna Duynes, Zaquan Stith, Azayah Palmer, Javil Painter, Adasia Butts, and Antonio Forrest. (2d Am. Compl. ¶ 1.)

Tort Claims Act, Va. Code § 8.01-195.1 *et seq.*, as well as common law negligence and gross negligence principles. This matter now comes before the Court on the motions to dismiss (ECF Nos. 49, 51, 54, 76) filed by Dr. Picio, the Armor Defendants, the VDOC Defendants and Nurses Sykes and Walker, respectively.[2]

For the reasons set forth below, the Court will grant in part and deny in part the motions. In sum, the Court will dismiss in full Count I, negligence against the VDOC Defendants, and Counts IV and V, deliberate indifference under the theories of supervisory liability and failure to train against Craft, Norris, Johnson, Patel, Ulep and Picio. The Court will dismiss Counts VII, for gross negligence, and VIII, for deliberate indifference, as to Dr. Picio only, and Count XI, seeking punitive damages, as to Armor, Allen, Seward and Walker. The Court will otherwise deny the motions. This case shall proceed on Counts II – III, and VI – XI of the Second Amended Complaint.

## I.   BACKGROUND

This negligence, gross negligence and § 1983 action arises out of Defendants' alleged failure to provide Duynes with requested and necessary medical treatment while detained by non-party the Virginia Department of Corrections ("VDOC"). Plaintiff alleges that, as a result of Defendants' failure, Duynes died from hemorrhagic pancreatitis due to obstructive cholelithiasis and cholecystitis, or, "in laymen's terms," gallstones, "a medical condition that should have been

---

[2]     As a result of delays in perfecting service of process, Dr. Patel and Ayanna Jackson have yet to file a motion to dismiss or other pleading in response to Plaintiff's Amended Complaint. However, in the interests of justice and judicial economy, where Plaintiff's allegations fail to state a claim against Patel or Jackson for the same reasons that Plaintiff fails to state a claim as to the other Defendants, the Court will also dismiss those claims as to Patel and/or Jackson. *See Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 555 n.1 (E.D. Va. 2020) (dismissing claims against defendant who had yet to appear where allegations proved identically insufficient against him as to moving defendants). Resultantly, the Court will dismiss Counts IV and V against Dr. Patel.

2

easily diagnosed and was completely treatable if diagnosed and managed." (2d Am. Compl. ¶¶ 69-70.)

### A.    Factual Background

At this stage, the Court must accept as true the facts set forth in the Second Amended Complaint (ECF No. 96). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant motions.

On June 2, 2019, then-38-year-old Duynes died in the sally port at Sussex I State Prison awaiting — for six hours — his emergency transport to the MCV Emergency Room. (2d Am. Compl. ¶¶ 18, 61, 68.) On several occasions over the preceding eight months, Duynes had reported to medical personnel, corrections staff and family persistent abdominal pain, nausea and vomiting, which proved unresponsive to treatment. (2d Am. Compl. ¶ 66.) Plaintiff herself "called the prison on several occasions over the eight months or more during which the decedent suffered in the defendants' custody. She spoke with on-duty corrections officers and on-duty medical personnel and advised that her son required immediate medical attention." (2d Am. Compl. ¶ 71.) Plaintiff alleges that the Defendants "were aware of the [ ] decedent's deteriorating medical condition, were aware that the decedent was not being provided access to necessary medical care, and by either act or omission failed to provide the decedent with the medical care necessary to save the decedent's life, in violation of federal and Virginia law." (2d Am. Compl. ¶¶ 74-75.)

### 1.    The Defendants

At all relevant times, VDOC held Duynes in custody at Sussex I State Prison through various corrections officers, including Defendants Sergeant Craft, Corrections Officer Moss, Sergeant Norris and Captain Johnson, "all of whom were on duty, and acting within the scope of

3

their employment, and whom were responsible for the decedent's health, welfare, and well-being during his time in custody." (2d Am. Compl. ¶¶ 2-3.) Johnson, Craft and Norris held supervisory positions "over the named defendant officers and medical staff; and [were] entrusted with the legal duty to see that the decedent received all constitutionally mandated medical care and monitoring." (2d Am. Compl. ¶ 4.)

Defendant Armor Correctional Health Services, Inc. "is a Corporation Company under the laws of the State of Florida and licensed to do business in the Commonwealth of Virginia" that "entered into a written contract with the VDOC and Sussex I State Prison to provide medical care to the inmates incarcerated at Sussex I State Prison." (2d Am. Compl. ¶¶ 6-7.) At all relevant times, Defendants Doctors Ulep, Picio and Patel, as well as Nurses Semlali, Walker, Seward, Jackson, Allen and Sykes "were duly appointed and actively employed as doctors, nurses, licensed practitioners, and/or trained medical personnel, each acting within the scope of their employment, agency, and servitude for Armor, Sussex I State Prison, and the VDOC." (2d Am. Compl. ¶ 8.)

### 2. Plaintiff's Allegations Relating to Duynes' Medical Care at Sussex I

On or about April 26, 2011, at age thirty, Duynes "was transferred to the custody of the VDOC" and received an intake physical that showed him "to be of general good health, with only a dental issue." (2d Am. Compl. ¶ 18.) Two years later, VDOC transferred Duynes to Sussex I State Prison, and his medical records at transfer indicated "that the decedent's only health issue was back pain." (2d Am. Compl. ¶ 19.)

On October 16, 2018, Duynes first reported his stomach pain to Nurse Walker. (2d Am. Compl. ¶ 20.) Duynes described extreme pain — a ten on a scale of one to ten — accompanied by excessive sweating, that was brought on by eating, walking and lying down, and forced him

4

to "ball up" for relief. (2d Am. Compl. ¶ 20.) Nurse Walker examined Duynes, "noted tenderness in the right upper quadrant of his abdomen" and prescribed Mylanta, "an over-the-counter medication to address symptoms of stomach acid." (2d Am. Compl. ¶ 20.) Nurse Walker recorded that Duynes needed examination from a "provider." (2d Am. Compl. ¶ 20.) Walker recorded the encounter in Duynes' jail records, to which all Defendants had access. (2d Am. Compl. ¶ 20.)

Six days later, having reviewed Nurse Walker's notes, Dr. Picio examined Duynes. (2d Am. Compl. ¶¶ 21-22.) Duynes complained of right upper quadrant abdominal pain and Dr. Picio misdiagnosed Duynes with indigestion. (2d Am. Compl. ¶ 22.) Dr. Picio did not otherwise facilitate or administer medical treatment, order any diagnostic testing or imaging to determine the cause of the decedent's excruciating pain, or order that Duynes be transported to an appropriate outside medical facility equipped to treat his medical condition. (2d Am. Compl. ¶ 22.)

On December 7, 2018, Duynes submitted a VDOC Emergency Grievance stating: "I have been experiencing extreme abdominal pain! This pain has been a recurring problem. Right now for the past few hours I've been experiencing excruciating pain on my right hand side. I need medical attention immediately." (2d Am. Compl. ¶ 23; Ex. C (ECF No. 42-3).) A VDOC employee acknowledged receipt of the grievance at 2:13 a.m. on December 8, 2018. (2d Am. Compl. ¶ 23; Ex. C.) Later that morning, at 8:46 a.m., Duynes sent a "JPAY message" to a family member, stating that he continued to experience intense stomach pain and asking the family member to call the prison officials to advise them of the situation, as he felt he had not received adequate care to treat his medical condition. (2d Am. Compl. ¶ 23; Ex. D (ECF No. 42-4).)

Sometime thereafter on December 8, 2018, Nurse Seward examined Duynes. (2d Am. Compl. ¶ 25.) At that time, Duynes complained of constant abdominal pain, reporting that "it felt like something was tugging in his stomach." (2d Am. Compl. ¶ 25.) Nurse Seward recorded in Duynes' medical records, accessible to all Defendants, that he needed referral for an examination by a physician. (2d Am. Compl. ¶ 25.) Seward did not provide any medical treatment, order or request any additional diagnostic testing, which would have determined the cause of Duynes' pain, order that he be transported to an appropriate outside medical facility equipped to treat his medical condition, and failed to ensure that he was examined by a medical doctor, as was medically warranted. (2d Am. Compl. ¶ 25.)

On December 16, 2018, Duynes presented to Nurse Allen, complaining of continued abdominal cramping, nausea, vomiting and pain with eating. (2d Am. Compl. ¶ 26.) He reported that those symptoms persisted despite taking Prilosec. (2d Am. Compl. ¶ 26.) Nurse Allen prescribed Simethicone for his symptoms and recorded the visit in Duynes' records, accessible to all Defendants. (2d Am. Compl. ¶ 26.) Nurse Allen otherwise did not provide medical treatment, conduct or recommend that any diagnostic testing be performed to determine the cause of Duynes' ongoing symptoms, provide him access to examination by a medical doctor, or order that he be transported to an appropriate outside medical facility equipped to treat his medical condition. (2d Am. Compl. ¶ 26.)

Two days later, without diagnostic testing, further evaluation or physician examination, an Armor employee prescribed Omeprazole to Duynes for 180 days. (2d Am. Compl. ¶¶ G, 27.) Duynes continued to complain to employees and/or agents of Armor, correctional officers and other inmates about his stomach pain and associated symptoms, which continued to worsen. (2d

6

Am. Compl. ¶ 28.)  Duynes' jail records documented this information and remained available to all Defendants.  (2d Am. Compl. ¶ 28.)

On January 11, 2019, an employee and/or agent of Armor saw Duynes for a follow-up examination.  (2d Am. Compl. ¶ 29.)  Duynes reported that Prilosec did not help his continued excruciating chronic abdominal pain and cramping.  (2d Am. Compl. ¶¶ H, 29.)  The Armor personnel noted that "the decedent's chronic complaints were misdiagnosed as irritable bowel and hypertension," and instead prescribed Bentyl and HCTZ.  (2d Am. Compl. ¶ 29.)  Again, Duynes' records reflected this visit and remained available to all Defendants.  (2d Am. Compl. ¶ 29.)  Further, the Armor personnel failed to correctly diagnose or treat Duynes' symptoms, or order any diagnostic testing that would have assisted them in correctly diagnosing the cause of Duynes' chronic abdominal pain and symptoms, which would have allowed them to have successfully treated him.  (2d Am. Compl. ¶ 29.)

As of January 27, 2019, despite multiple Defendants having referred Duynes for evaluation and treatment by a medical doctor, a doctor had not seen him for examination and treatment of his deteriorating medical condition.  (2d Am. Compl. ¶ 30.)  Accordingly, that day, Duynes submitted an Offender Request for physical examination by a doctor, reporting that his stomach pain "[was] still doing the same thing" and that he continued to experience extreme pain that had not been adequately addressed.  (2d Am. Compl. ¶ 30; Ex. E (ECF No. 42-5).)  Nurse Walker acknowledged this request over one week later, on February 4, scheduling Duynes for an appointment.  (2d Am. Compl. ¶ 30; Ex. E.)

The night that Duynes sent his request, he had "crazy pain" in his stomach and began to vomit from his nose.  (2d Am. Compl. ¶ 31; Ex. F (ECF No. 42-6).)  The following morning Duynes sent another JPAY message requesting that a family member call the prison to intervene

7

and get Defendants to provide the necessary medical treatment to diagnose and treat his

worsening condition.  (2d Am. Compl. ¶ 31; Ex. F.)

   Also on January 28, 2019, Duynes received a note from Dr. Patel stating that his labs had

come back "abnormal."  (2d Am. Compl. ¶ 32.)  Accordingly, the document noted that he needed

examination during his next chronic care clinic visit.  (2d Am. Compl. ¶ 32.)  Dr. Patel otherwise

failed to examine or treat Duyne, provide him with any diagnostic testing or order that he be

transported to an appropriate outside medical facility with staff equipped to treat his serious

medical condition.  (2d Am. Compl. ¶ 32.)

   On February 5, 2019, Duynes filed yet another grievance with VDOC notifying all

Defendants that Armor was not providing adequate medical evaluation and treatment, and

requesting outside help:

> Look, I need to be seen by a [sic] outside doctor or hospital [sic] its [sic] something
> wrong with my stomach and this prison is not willing to help me with [sic].  I have
> been in pain for some months now.  I let them know my stomach hurt [sic] they put
> me on blood pressure pills.

(2d Am. Compl. ¶ 33.)

   On February 6, 2019, Duynes again presented to Nurse Walker, complaining of ongoing

pain and progressing symptoms.  (2d Am. Compl. ¶ 34.)  Duynes described the pain as extending

from his right upper quadrant to the lower quadrant and associated vomiting, as well as needing

to eat only rice and fish, because all other food exacerbated his symptoms.  (2d Am. Compl.

¶ 34.)  Nurse Walker noted Duynes' abnormal lab work, pending blood tests and need for

examination by a doctor.  (2d Am. Compl. ¶ 34.)  Nurse Allen reviewed the notes from this visit,

but neither Defendant Allen, Walker, nor any other defendant, requested or attempted to order

any diagnostic testing to determine the cause of his deteriorating medical condition, a condition

which was readily diagnosable and treatable if proper medical procedures had been implemented. (2d Am. Compl. ¶ 34.)

On February 12, 2019, Duynes followed up and saw Nurse Jackson, now reporting the additional symptom of epigastric discomfort and gas. (2d Am. Compl. ¶ 35.) Duynes again described the ineffectiveness of the Prilosec, and Nurse Jackson noted Duynes' need for examination by a doctor. (2d Am. Compl. ¶ 35.) Nurse Jackson did not order or conduct diagnostic testing, provide medical treatment or order transport to an appropriate outside medical facility to treat Duynes' deteriorating condition. (2d Am. Compl. ¶ 35.)

On or about April 12, 2019, the records indicate that Armor employees and/or agents prescribed Dicyclomine, Ranitidine, Gaviscon foam tab chews and HCTZ to Duynes for 180 days. (2d Am. Compl. ¶ 36.) Defendants did not provide Duynes with access to a physician, diagnostic testing, an outside medical facility or any other medical treatment for nearly four months. (2d Am. Compl. ¶ 36.)

On June 1, 2019, Duynes' condition took a dramatic turn for the worse. (2d Am. Compl. ¶¶ P, 37.) That morning, fellow inmates helped Duynes down the stairs from his cell. (2d Am. Compl. ¶ 37.) Duynes, unable to stand or ambulate without assistance, was crying due to the worsening extreme stomach pains that he had been complaining of since at least October 16, 2018. (2d Am. Compl. ¶ 37.) All who observed Duynes could see the seriousness of his open and obvious medical condition. (2d Am. Compl. ¶ 37.) Corrections Officer Moss, assigned to Duynes' cell block, notified his supervisor, Sergeant Craft, that Duynes was throwing up blood. (2d Am. Compl. ¶ 38.) Sergeant Craft did not do anything to provide Duynes with access to medical care, thereby failing to respond to the existing emergency. (2d Am. Compl. ¶ 39.) Likewise, Officer Moss did nothing in the face of the information known to him, thereby failing

to provide Duynes with access to medical care and treatment. (2d Am. Compl. ¶ 40.) Instead, after an unreasonable amount of time elapsed, Moss merely permitted several inmates to assist Duynes to the medical unit by opening the automatic doors for them. (2d Am. Compl. ¶ 40.)

Upon arrival in the medical unit, Duynes was placed in a wheelchair, where he continued to cry due to pain and beg the corrections officers and medical personnel for help. (2d Am. Compl. ¶ 41.) Duynes complained to Nurse Semlali of nausea, vomiting and pain rated at an eight out of ten. (2d Am. Compl. ¶ 42.) Duynes presented a bag of his vomit to the medical personnel, which tested positive for blood. (2d Am. Compl. ¶ 42.) Despite knowledge of Duynes' complete medical history and then-present complaints, Nurse Semlali told Duynes that "nothing was wrong." (2d Am. Compl. ¶ 42.) Duynes threw himself on the floor in a "last-gasp" attempt to get the Armor Correctional employees and/or agents to properly and finally take his complaints seriously and get him the proper medical treatment. (2d Am. Compl. ¶ 42.) However, Nurse Semlali berated Duynes, baselessly telling him that nothing was wrong with him. (2d Am. Compl. ¶ 42.) Semlali ignored her objective knowledge of the medical emergency and discharged Duynes without providing medical treatment or diagnosis. (2d Am. Compl. ¶¶ 42, R.) Instead, she merely provided Duynes with over-the-counter medications that had failed to provide relief in the past, including Emetrol, Tylenol and Pepto Bismol, and reminded him to drink at least eight ounces of water a day. (2d Am. Compl. ¶ 42.)

Fellow inmates helped Duynes, who still could not walk, back to his cell block by wheelchair. (2d Am. Compl. ¶ 43.) Once there, several inmates lifted Duynes out of the wheelchair to return him into his cell block, because Duynes could not get out of the chair on his own. (2d Am. Compl. ¶ 43.) The inmates then advised Officers Moss and Norris that Nurse Semlali failed to treat Duynes and discharged him without checking on him or looking at him.

(2d Am. Compl. ¶¶ 44-45.)  At that time, Duynes lay on the concrete floor, crying, spitting up blood and pleading to the corrections officers and medical personnel to take him to the hospital immediately.  (2d Am. Compl. ¶ 46.)  Upon being advised of Duynes' serious medical condition and Nurse Semlali's failure to treat Duynes, Sergeant Craft reported his concerns to Semlali, but failed to take any other action.  (2d Am. Compl. ¶ 47.)  While on duty and aware of Duynes' serious and quickly deteriorating medical condition that morning, Moss, Norris and Craft ignored Duynes' condition for several hours, as he continued to spit up blood, cry and writhe in pain.  (2d Am. Compl. ¶ 48.)

After several hours of Duynes writhing in pain and demanding medical treatment, Officer Moss finally contacted Sergeant Craft to advise that Duynes continued to lay on the floor spitting up blood.  (2d Am. Compl. ¶ 49.)  A group of prisoners again started to voice their complaints and advocate for the corrections officers to facilitate Duynes' access to medical care.  (2d Am. Compl. ¶ 50.)  Eventually, other inmates and one corrections officer helped the decedent back to the medical unit that afternoon.  (2d Am. Compl. ¶ 50.)

At 3:34 p.m., Duynes returned to the medical unit via wheelchair complaining of nausea, vomiting and stomach pain rated at an eight out of ten, while sweating, nauseous and carrying another bag containing his vomit.  (2d Am. Compl. ¶ 51.)  At last, Nurse Semlali contacted Dr. Ulep.  (2d Am. Compl. ¶ 52.)  She also kept Duynes in the medical unit for observation and administered Phenergan for his symptoms of nausea and vomiting.  (2d Am. Compl. ¶ 52.)  Neither Nurse Semlali, Dr. Ulep, nor any other medical personnel conducted any examination or diagnostic testing to determine the cause of Duynes' symptoms, provided any other medical treatment, nor did they take any action to arrange transport for Duynes to go to the appropriate emergency room, as his symptoms clearly warranted inpatient treatment by trained emergency

11

medical staff.  (2d Am. Compl. ¶ 53.)  Duynes' medical records reflect that Nurse Semlali checked on him as he lay in bed at 5:40 p.m., that he reported vomiting twice and refused food and drink.  (2d Am. Compl. ¶ 54.)

At approximately 11:26 p.m., now in the care of Nurse Sykes, Duynes reported another episode of vomiting and continued abdominal pain to on-duty medical personnel.  (2d Am. Compl. ¶ 55.)  Nurse Sykes reviewed Duynes' medical records and personally observed him, making her aware of his condition.  (2d Am. Compl. ¶ 55.)  Nurse Sykes noted that Duynes' stomach was tender to the touch and that he described belching and flatulence with pain rated at an eight out of ten.  (2d Am. Compl. ¶ 56.)  Sykes merely provided Duynes with over-the-counter Tylenol, making no attempt to treat him under circumstances that demanded that he receive treatment by a medical facility with emergency medical staff, or at the very least, attempt to otherwise alleviate his pain and suffering.  (2d Am. Compl. ¶ 56.)

Twice more that night, Nurse Sykes checked on Duynes.  (2d Am. Compl. ¶ 57-60.)  At approximately 1:36 a.m. on June 2, 2019, Nurse Sykes noted that Duynes lay on his bed with a towel over his eyes and that she could not awaken him.  (2d Am. Compl. ¶ 57.)  By 3:15 a.m., Duynes had awakened and reported to Nurse Sykes another episode of vomiting and an increase in abdominal pain at ten out of ten.  (2d Am. Compl. ¶¶ 58-59.)  Nurse Sykes recorded that Duynes appeared noticeably uncomfortable and easily agitated, shifted his weight, closed his eyes even when speaking and held his abdomen.  (2d Am. Compl. ¶ 59.)  Nurse Sykes merely provided Duynes with medications including Bentyl, Tylenol and Phenergan, none of which had alleviated his symptoms in the past.  (2d Am. Compl. ¶ 59.)  Despite making note of her subjective knowledge of Duynes' deteriorating medical condition, Defendant Sykes made no

effort to treat him nor arrange transport to the hospital, which his condition clearly warranted. (2d Am. Compl. ¶ 60.)

At 5:00 a.m., on June 2, 2019, after six hours of observing Duynes, Nurse Sykes finally notified a doctor of his deteriorating condition. (2d Am. Compl. ¶¶ U, 61.) Sykes reported that Duynes' abdomen proved tender to the touch and that he experienced a pain level of 10 out of 10, continued nausea and inability to have a bowel movement even though he tried. (2d Am. Compl. ¶ 61.) Hearing this, the medical doctor immediately recommended Duynes' transport to MCV Emergency Room via a security van. (2d Am. Compl. ¶ 61.)

Yet, neither Defendant Johnson nor any other on-duty Defendant facilitated transport of Duynes to a hospital emergency room for more than five hours. (2d Am. Compl. ¶ 61.) Nurse Sykes notified the watch commander, Captain Johnson, of the doctor's order at 5:10 a.m. (2d Am. Compl. ¶ 61.) Only after the passage of three hours, at approximately 7:55 a.m., did any Armor employee and/or agents follow up with Captain Johnson to inquire about the time of Duynes' departure to the emergency room. (2d Am. Compl. ¶ 62.) Captain Johnson stated that he was working to put security staff in place for the transport. (2d Am. Compl. ¶ 62.) By 9:00 a.m., Nurse Semlali had resumed care for Duynes and recorded that his abdomen remained tender to the touch and that he continued to vomit a light brown liquid. (2d Am. Compl. ¶ 63.) At 9:16 a.m., upon Semlali's inquiry, Captain Johnson once again reported that a team was being put together for Duynes' transport to an emergency room. (2d Am. Compl. ¶ 64.) At 9:53 a.m., Nurse Semlali transported Duynes to the sally port to wait on emergency transport. (2d Am. Compl. ¶ 65.)

Shortly thereafter, Duynes would die there in the sally port, awaiting transport to the emergency room. At 10:30 a.m., twenty-four hours after Duynes first went to the medical unit

13

with a bag of bloody vomit and abdominal pain, and nearly eight months after he first reported abdominal pain to medical personnel and corrections staff at Sussex I, Nurse Semlali received a call from the sally port that Duynes had become unresponsive.  (2d Am. Compl. ¶ 66.)  At 10:35 a.m., Nurse Semlali arrived in the sally port to find Duynes sitting in the wheelchair, shaking.  (2d Am. Compl. ¶ 67.)  Nurse Semlali asked Duynes if he was okay, and he did not respond.  (2d Am. Compl. ¶ 67.)  At 10:40 a.m., Nurse Semlali moved Duynes to the floor, applied AED and began CPR.  (2d Am. Compl. ¶ 67.)  Semlali asked security to call 911, and EMTs arrived at 10:55 a.m.  (2d Am. Compl. ¶ 67.)  The EMTs continued CPR, administered Epi and Narcan and intubated Duynes.  (2d Am. Compl. ¶ 67.)  Sixteen minutes later, the EMTs called Dr. Clark at Southside Regional Medical Center, who advised them to stop CPR.  (2d Am. Compl. ¶ 68.)  Dr. Clark called Duynes' time of death at 11:11 a.m. on June 2, 2019.  (2d Am. Compl. ¶ 68.)

Some weeks later, a Virginia-licensed medical examiner determined that Duynes cause of death was hemorrhagic pancreatitis due to obstructive cholelithiasis and cholecystitis.  (2d Am. Compl. ¶¶ X, 69.)  In laymen's terms, Duynes died from gall stones, an easily diagnosable and treatable medical condition.  (2d Am. Compl. ¶ 70.)

Plaintiff, Duynes' mother, called the prison on several occasions over the eight months or more during which Duynes suffered in Defendants' care.  (2d Am. Compl. ¶ 71.)  She spoke with on-duty corrections officers and on-duty medical personnel and advised that her son required immediate medical attention.  (2d Am. Compl. ¶ 71.)  In spite of all of the information known to them, Defendants failed to take the necessary steps to provide Duynes with the medical treatment necessary to save his life.  (2d Am. Compl. ¶ 71.)  All of the Defendants were on-duty during the time period at issue and had the responsibility to maintain the health and welfare of the inmates in custody of Sussex I State Prison, including Duynes specifically.  (2d Am. Compl. ¶ 73.)  Each

of the Defendants had awareness of Duynes' deteriorating medical condition and knew that he was not being provided access to necessary medical care. (2d Am. Compl. ¶¶ 74-75.) By their acts and/or omissions, Defendants failed to provide Duynes with the medical care necessary to save his life. (2d Am. Compl. ¶¶ 74-75.)

### B.    Procedural History

On November 10, 2021, Plaintiff filed her Amended Complaint (ECF No. 42) against Defendants, raising eleven counts for relief based on the above allegations. Counts One through Three address the VDOC Defendants: Sergeant Craft, Corrections Officer Moss, Sergeant Norris and Captain Johnson. (Am. Compl. ¶¶ 5, V, VI, VII.) Count One asserts a negligence claim of wrongful death, alleging, *inter alia*, failure to facilitate appropriate medical attention for Duynes' medical condition. (Am. Compl. ¶¶ 76–90.) Count Two asserts a gross negligence claim resulting in death based on the same actions. (Am. Compl. ¶¶ 91–102.) Count Three asserts a deliberate indifference to serious medical need claim against the VDOC Defendants, alleging that they failed to facilitate any diagnostic testing and medical treatment in spite of their awareness of Duynes' serious medical condition in violation of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. (Am. Compl. ¶¶ 103–17.)

Counts Four and Five address a combination of some of the VDOC and Armor Defendants based on their supervisory roles: Sergeant Craft, Sergeant Norris, Captain Johnson, Dr. Patel, Dr. Ulep and Dr. Picio (the "Supervisory Defendants"). (Am. Compl. ¶¶ VIII, IX.) Count Four asserts a deliberate indifference claim of supervisory liability, alleging that the Supervisory Defendants tacitly authorized their subordinates' conduct, which posed a pervasive and unreasonable risk of constitutional injury to citizens like Duynes, in violation of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. (Am. Compl. ¶¶ 118–28.) Count Five

15

asserts a deliberate indifference claim of failure to train, supervise, and control, alleging the Supervisory Defendants had a policy, custom and/or practice of failing to effectively train, supervise and control their subordinates regarding the appropriate provision of medical care in violation of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. (Am. Compl. ¶¶ 129–38.)

Counts Six through Eight address the on-duty medical personnel: Defendants Doctors Ulep, Picio and Patel, as well as Nurses Semlali, Walker, Seward, Jackson, Allen and Sykes. (Am. Compl. ¶¶ X, XI, XII.) Count Six alleges a negligence claim of wrongful death, certifying, pursuant to Virginia Code § 8.01-50.1, that a qualified expert has rendered a written opinion that the medical personnel's and Armor's actions deviated from the applicable standard of care, proximately causing the death of Duynes. (Am. Compl. ¶¶ 139–53.) Count Seven asserts a gross negligence claim resulting in death, alleging failure to provide necessary and adequate medical treatment against Doctors Ulep, Picio and Patel, as well as Nurses Semlali and Sykes. (Am. Compl. ¶¶ 154–63.) Count Eight asserts, also against Doctors Ulep, Picio and Patel, as well as Nurses Semlali and Sykes, a deliberate indifference to serious medical need claim, alleging they failed to facilitate any diagnostic testing and medical treatment in spite of their awareness of Duynes' serious medical condition in violation of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. (Am. Compl. ¶¶ 164–75.)

Counts Nine and Ten address Armor. (Am. Compl. ¶¶ XIII, XIV.) Count Nine asserts a negligence claim, alleging failure to train and supervise its employees and to provide Duynes with medical treatment, monitoring, diagnostic testing, and access to emergency medical facilities. (Am. Compl. ¶¶ 176–82.) Count Ten asserts a gross negligence claim resulting in

death based on the same actions, alleging that those acts were designed purely to inflict discomfort, humiliation, embarrassment and other harm to Duynes. (Am. Compl. ¶¶ 183–88.)

Count Eleven asserts a claim against all Defendants for punitive damages, alleging that they acted with actual malice toward Duynes. (Am. Compl. ¶¶ 189-93.) Based upon the foregoing claims, Plaintiff seeks, jointly and severally, compensatory damages of five million dollars and punitive damages of ten million dollars, plus all costs and interest as permitted by law. (Am. Compl. ¶ 193.)

Defendants filed their motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 15, 2021, and March 17, 2022.[3] (ECF Nos. 49, 51, 54, 76.) In the motions to dismiss, Defendants principally challenge the sufficiency of Plaintiff's allegations to amount to deliberate indifference, gross negligence or simple negligence. Additionally, the VDOC Defendants argue that they enjoy sovereign immunity as to Plaintiff's negligence claim, and that Virginia's one-year statute of limitations bars her gross negligence claim. (Mem. Supp. VDOC Mot. 13-18 (ECF No. 55).) Plaintiff responded on January 12 and March 31, 2022,

---

[3]     Defendants Dr. Patel and Ayanna Jackson have yet to appear in this case and, as such, do not join in the motions to dismiss presently before the Court.

     Additionally, as to Dr. Picio's Motion to Dismiss (ECF No. 49), Plaintiff argues that Dr. Picio waived his right to so move by filing an Answer (ECF No. 24) to the original Complaint without including failure to state a claim as an affirmative defense. (Resp. Opp'n Picio Mot. at 11-12 (ECF No. 58).) Rule 12 of the Federal Rules of Civil Procedure requires that "[a] motion asserting any of these defenses [including failure to state a claim upon which relief can be granted] must be made before pleading if a responsive pleading is allowed." However, in this case, the Court directed (ECF No. 37) Plaintiff to file an Amended Complaint, thereby necessitating new responsive pleadings from Dr. Picio. Dr. Picio has not yet filed a Rule 7(a) pleading in response to the Amended Complaint (ECF No. 42). Accordingly, the Court determines that Dr. Picio has timely filed, without waiving, his Motion to Dismiss for failure to state a claim. Moreover, pursuant to Rule 12(h), only those defenses listed in Rule 12(b)(2)-(5) — and not the Rule 12(b)(6) defense of failure to state a claim — are waived by a party when failing to include it in a motion or responsive pleading.

respectively. (ECF Nos. 56-58, 85.) Those Defendants who filed a reply in support of their motion did so on January 26, 2022. (ECF Nos. 59-61.) Defendants Sykes and Walker did not file a reply, and the time to do so has elapsed, rendering this matter ripe for review.

On June 1, 2022, the Court granted Plaintiff's Motion to Amend (ECF No. 83) allowing Plaintiff to file a Second Amended Complaint (ECF No. 96), which merely corrects the misnomer of Defendant "M. Syes" to "Makeshia Sykes" and leaves the allegations otherwise unchanged. The Court ordered that responsive pleadings filed on behalf of Defendants as to the prior Amended Complaint shall be deemed filed as to the Second Amended Complaint, without need to re-file, and remain pending for ruling before the Court.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a

18

cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III.   ANALYSIS

The Court will begin by discussing Plaintiff's § 1983 claims for deliberate indifference in violation of the Eighth and Fourteenth Amendments, including Plaintiff's theories of direct liability, supervisory liability and liability for failure to train, supervise and control. Next, the Court turns to Plaintiff's claims for gross negligence. Then, the Court addresses Plaintiff's ordinary negligence claims before concluding with the sufficiency of the allegations to support her claim for punitive damages.

### A.   Deliberate Indifference

The Court finds that Plaintiff has adequately stated a claim for deliberate indifference against, Sergeant Craft, Corrections Officer Moss, Sergeant Norris, Captain Johnson, Dr. Ulep, Nurse Semlali and Nurse Sykes.

The Eighth Amendment imposes duties on prison officials to "provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To that end, "[a] prison official's

19

deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021).

To state an Eighth Amendment claim, an inmate must allege facts showing "(1) that *objectively* the deprivation of a basic human need was 'sufficiently serious,' and (2) that *subjectively* the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (emphasis added)).

First, under the objective prong, the inmate must allege facts to suggest that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that constitutes "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381).

In the context of a claim for deliberate indifference to medical needs, like the case at bar, the objective prong requires a plaintiff to establish "that his medical condition was objectively serious — that is, 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hixson*, 1 F.4th at 302 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

Second, under the subjective prong, the plaintiff must establish that the official "subjectively knew of and disregarded an excessive risk to the inmate's health or safety." *Id.* (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). Again, in the deliberate indifference to medical needs context, the subjective prong requires the plaintiff to allege "actual

subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178. "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (cleaned up). A prison official's "failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs." *Id.*

"Deliberate indifference is a very high standard — a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (requiring facts demonstrating that the defendant actually drew the inference of the risk of harm). Thus, to survive a motion to dismiss, the deliberate indifference standard requires a plaintiff to assert facts sufficient to form an inference that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his [or her] actions

were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

### 1.     Objective Prong

The Court finds, for the purposes of the motions to dismiss, that Plaintiff has satisfied the objective prong of the deliberate indifference test by establishing that Duynes had a "serious medical need so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (cleaned up).  Defendants do not contest this point. Reading the facts in the light most favorable to Plaintiff, Duynes' consistent pleas for help and complaints about severe stomach pain, nausea, cramping, excessive sweating, vomiting, and, at times, inability to walk show a "medical need . . . so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*; *see, e.g.*, *Sams v. Armor Corr. Health Servs., Inc.*, 2020 WL 5835310, at *21 (E.D. Va. Sept. 30, 2020) (finding that plaintiff's "consistent pleas for help and complaints about headaches, nausea, hot and cold flashes, head pressure, and inability to hold down food . . . . readily satisfies the objective prong."); *Brown v. D.C.*, 514 F.3d 1279, 1284 (D.C. Cir. 2008) ("The intense and often relentless pain that accompanies [gallstones], and the complications that can follow, easily push Brown's claim into the category of serious medical needs."); *Toombs v. Bell*, 798 F.2d 297, 298 (8th Cir. 1986) (holding that alleged gallstones constituted a serious medical need).

Because Plaintiff satisfies the objective prong of the deliberate indifference claim, the Court turns to whether Plaintiff has met the subjective prong of the deliberate indifference test against each Defendant moving for dismissal.

### 2. Subjective Prong

#### a. *VDOC Defendants*

To bring a medical needs claim against a non-medical prison official, a plaintiff must establish that the defendant (1) "failed promptly to provide an inmate with needed medical care," (2) "deliberately interfered with the prison doctors' performance," or (3) "tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990). Plaintiff argues that the actions of each of the VDOC Defendants "fall squarely within options (1) and (3)," thereby demonstrating their deliberate indifference. (Resp. Opp'n VDOC Mot. at 22 (ECF No. 56).) The VDOC Defendants argue that they "were not in a position to diagnose Duynes or offer him medication," suggesting that to do so would amount to unlicensed practice of medicine. (Mem. Supp. VDOC Mot. at 22 (ECF No. 55).) They cite *Miltier* and *Iko* for the proposition that "[n]on-medical prison personnel are entitled to rely on the opinion of the medical staff as to the proper course of treatment." (Mem. Supp. VDOC Mot. at 20.) However, on this Count for direct liability, as in *Iko*, "[t]he officers face liability for *their own* decisions, made while [Duynes] was in their charge. The proposition elucidated in . . . *Miltier* — that a distant prison official can generally rely on his medical staff's examinations and diagnoses — is therefore irrelevant to the issue before us." 535 F.3d at 242.

"A correctional officer's refusal to call for medical staff is usually sufficient, at the motion to dismiss stage, to sustain a claim that the officer was personally involved in the denial of treatment or deliberately interfered with treatment." *Boley v. Armor Corr. Health Servs., Inc.*, 2022 WL 905219, at *6 (E.D. Va. Mar. 28, 2022) (collecting cases). Additionally, "[c]ourts have also found correctional officers liable in cases where the officers delayed contacting medical staff and that delay resulted in substantial harm." *Id.* As Plaintiff must demonstrate that

23

each Defendant, "through the official's own individual actions," has violated the inmate's constitutional rights, the Court will analyze whether each Defendant's actions amounted to a refusal or delay in calling for medical help. *Iqbal*, 556 U.S. at 676.

          i.      *Sergeant Craft, Corrections Officer Moss and Sergeant Norris*

The Court finds that Plaintiff has stated a plausible claim for deliberate indifference with respect to Sergeant Craft, Corrections Officer Moss and Sergeant Norris. Assuming the facts alleged to be true and viewing them in the light most favorable to Plaintiff, the Second Amended Complaint plausibly alleges that Craft, Moss and Norris knew of and disregarded Duynes' serious medical need.

Plaintiff's allegations regarding Craft, Moss and Norris arise from their interactions with Duynes as his deteriorating medical condition exacerbated on June 1, 2019. Plaintiff has alleged that these Defendants at least delayed in facilitating medical care. The Second Amended Complaint avers that, that morning, fellow inmates helped Duynes down the stairs from his cell. (2d Am. Compl. ¶ 37.) Duynes, unable to stand or ambulate without assistance, was crying due to the worsening extreme stomach pains that he had been complaining of since at least October 16, 2018. (2d Am. Compl. ¶ 37.) All who observed Duynes could see the seriousness of his open and obvious medical condition. (2d Am. Compl. ¶ 37.) Corrections Officer Moss, assigned to Duynes' cell block, notified his supervisor, Sergeant Craft, that Duynes was throwing up blood. (2d Am. Compl. ¶ 38.) Sergeant Craft took no actions to provide Duynes with access to medical care, thereby failing to respond to the existing emergency. (2d Am. Compl. ¶ 39.) Likewise, Officer Moss did nothing in the face of the information known to him, thereby failing to provide Duynes with access to medical care and treatment. (2d Am. Compl. ¶ 40.) Instead,

after an unreasonable amount of time elapsed, Moss merely permitted several inmates to assist Duynes to the medical unit by opening the automatic doors for them.  (2d Am. Compl. ¶ 40.)

Duynes returned from the medical unit in a wheelchair, having been told that nothing was wrong with him and merely provided over-the-counter medications that had failed to provide relief in the past.  (2d Am. Compl. ¶¶ 42-43.)  Once there, several inmates lifted Duynes out of the wheelchair to return him into his cell block, because Duynes could not get out of the chair on his own.  (2d Am. Compl. ¶ 43.)  The inmates then advised Officers Moss and Norris that Nurse Semlali failed to treat Duynes and discharged him without checking on him or looking at him.  (2d Am. Compl. ¶¶ 44-45.)  At that time, Duynes lay on the concrete floor, crying, spitting up blood and pleading to the corrections officers and medical personnel to take him to the hospital immediately.  (2d Am. Compl. ¶ 46.)  Upon being advised of Duynes' serious medical condition and Nurse Semlali's failure to treat Duynes, Sergeant Craft reported his concerns to Semlali, but failed to take any other action.  (2d Am. Compl. ¶ 47.)  While on duty and aware of Duynes' serious and quickly deteriorating medical condition that morning, Moss, Norris and Craft ignored Duynes' condition for several hours, as he continued to spit up blood, cry and writhe in pain.  (2d Am. Compl. ¶ 48.)

After several hours of Duynes suffering in pain and demanding medical treatment, Officer Moss finally contacted Sergeant Craft to advise that Duynes continued to lay on the floor spitting up blood.  (2d Am. Compl. ¶ 49.)  A group of prisoners again started to voice their complaints and advocate for the corrections officers to facilitate Duynes' access to medical care.  (2d Am. Compl. ¶ 50.)  Eventually, other inmates and one corrections officer helped the decedent back to the medical unit that afternoon.  (2d Am. Compl. ¶ 50.)

First, the Second Amended Complaint includes facts that demonstrate Craft, Moss and Norris had "actual knowledge of the risk of harm to the inmate." *Iko*, 535 F.3d at 241.  Moss initially observed Duynes' "open and obvious" medical condition of stomach pain so extreme as to produce tears and inability to stand or walk. (2d Am. Compl. ¶ 37.)  Moss reported Duynes' condition to Craft, including that Duynes "was throwing up blood." (2d Am. Compl. ¶ 38.) When Duynes returned from medical, inmates reported Duynes' discharge without treatment to Moss and Norris, as Duynes "was [ ] on the concrete floor, crying, and spitting up blood, pleading with the corrections officers and medical personnel to take him to the hospital immediately." (2d Am. Compl. ¶¶ 44-46.)  The officers also advised Craft of Nurse Semlali's failure to treat Duynes. (2d Am. Compl. ¶ 47.)  These facts support the conclusion that "Officer Moss, Sergeant Norris, and Sergeant Craft were all on-duty and aware of the decedent's serious and quickly deteriorating medical condition on June 1, 2019." (2d Am. Compl. ¶ 48.)  Because "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 843, the Court finds that the Second Amended Complaint alleges that Craft, Moss and Norris had "actual knowledge of the risk of harm to the inmate." *Iko*, 535 F.3d at 241.

Second, Plaintiff also avers facts demonstrating that Craft, Moss and Norris "recognized that [their] actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Iko*, 535 F.3d at 241.  Plaintiff alleges that Duynes experienced an obvious medical emergency and that "an unreasonable amount of time" elapsed before Craft, Moss and Norris intervened. (2d Am. Compl. ¶ 40.)  "Where a prisoner is showing outward signs of serious medical distress, courts have found that even a brief delay in calling for medical assistance may constitute deliberate indifference." *Sams*, 2020 WL 5835310, at *29

26

(citing *Coats v. Pope*, 2019 WL 5586871, at *7 (D.S.C. Oct. 30, 2019) (finding plaintiff had stated claim for deliberate indifference where correctional officers delayed forty-three minutes in calling for medical assistance where prisoner was "sweating and breathing heavily, vomiting, incapable of speaking, standing or walking, and having seizures"); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 652 (E.D. Va. 2004) (finding triable issue of deliberate indifference where prisoner was suffering from "heavy sweating, vomiting, incoheren[t], and [unable] to walk" but patrolling guards "took virtually no action in response").

Here, Plaintiff alleges that once Moss and Craft had knowledge of Duynes' medical emergency, both failed to provide immediate access to medical care, and "[a]fter an unreasonable amount of time elapsed, Moss merely opened the automatic door to permit several inmates to assist the decedent to the medical unit." (2d Am. Compl. ¶¶ 39-40.)  Accordingly, Plaintiff plausibly alleges that Moss and Craft delayed in facilitating medical care in this first instance.  Additionally, when Duynes returned to the cell block without treatment, Craft initially "reported his concerns to Nurse Semlali in medical, but failed to take any appropriate actions that the circumstances dictated." (2d Am. Compl. ¶ 47.)  Indeed, Duynes then "continued to spit up blood, cry, and writhe in pain" for "several hours" while Moss, Norris and Craft ignored his condition. (2d Am. Compl. ¶¶ 48-49.)  It was not until "several hours" passed before Moss contacted Craft to initiate Duynes' return to the medical unit.

In *Caramillo v. Correct Care Solutions, LLC*, the Court denied a motion to dismiss where jail deputies disregarded the inmate's requests for medical treatment despite being aware that the inmate's condition — vomiting, losing weight and discolored skin — had not improved. 2020 WL 4747786, at *2-3, *14-15 (E.D. Va. Feb. 28, 2020).  The court determined that the jail deputies could not avoid responsibility merely because the inmate had some interactions with

27

medical staff since the inmate was not being housed or actively monitored by the infirmary. *Id.* at *15.  And in *Boley*, the court denied a motion to dismiss where a jail deputy similarly disregarded plaintiff's complaints and requests to see a nurse for his chest pain. 2022 WL 905219, at *6.  The court held that "the fact that Boley had seen a nurse earlier in the day does not mean that Defendant Guy could not have withheld treatment later in the day." *Id.*

Likewise, the fact that Nurse Semlali saw Duynes earlier, and that she dismissed Craft's concerns, does not excuse Craft, Moss and Norris from subsequently failing to facilitate medical care for several hours while Duynes "continued to spit up blood, cry, and writhe in pain." (2d Am. Compl. ¶ 48.)  Accordingly, in this second incident, Norris joined Moss and Craft in delaying to facilitate medical care.  Due to the apparent seriousness of Duynes' condition, and the fact that each Craft, Moss and Norris delayed in facilitating medical care, the Court finds that Plaintiff has plausibly pleaded that they "recognized that [their] actions were insufficient to mitigate the risk of harm to the inmate arising from [Duynes'] medical needs." *Iko*, 535 F.3d at 241.

Therefore, the Court concludes that Plaintiff has sufficiently alleged that Sergeant Craft, Corrections Officer Moss and Sergeant Norris knew of and disregarded a substantial risk of serious harm to Duynes.  Thus, Plaintiff has stated a plausible claim for deliberate indifference against Craft, Moss and Norris, and the Court will deny the VDOC Defendants' Motion to Dismiss in that regard.

### ii.    *Captain Johnson*

Additionally, the Court finds that Plaintiff has stated a plausible claim for deliberate indifference with respect to Captain Johnson.  Like the other VDOC Defendants, Johnson faces allegations that he at least delayed in facilitating emergency medical care — in his case, delaying

in facilitating emergency transport for more than five hours, causing Duynes' death.  Plaintiff

avers that, at 5:00 a.m. on June 2, 2019, a medical doctor recommended Duynes' transport to

MCV Emergency Room via a security van.  (2d Am. Compl. ¶ 61.)  Nurse Sykes reported the

need for emergency transport to Captain Johnson, the watch commander, ten minutes later.  (2d

Am. Compl. ¶ 61.)  Three hours later, Johnson stated that he was still working to put security

staff in place for the transport.  (2d Am. Compl. ¶ 62.)  At 9:16 a.m., Captain Johnson once again

reported that he was putting together a team for Duynes' transport to an emergency room.  (2d

Am. Compl. ¶ 64.)  By 11:11 a.m., Duynes had died in the sally port, still awaiting

transportation.  (2d Am. Compl. ¶ 68.)

        The Court finds that these facts demonstrate that Johnson had "actual knowledge of the

risk of harm to the inmate" and that Johnson "recognized that his actions were insufficient to

mitigate the risk of harm to the inmate arising from his medical needs."  *Iko*, 535 F.3d at 241.

By virtue of receiving the report of a doctor's recommendation for emergency transportation for

treatment in an emergency room, Johnson clearly had actual knowledge of the risk of harm to

Duynes.  Like the other VDOC Defendants, Johnson's grave delay in facilitating that

transportation plausibly establishes that he "recognized that his actions were insufficient to

mitigate the risk of harm to the inmate arising from his medical needs."  *Iko*, 535 F.3d at 241.

        In *Coats*, the court denied the officer defendants' motion for summary judgment, finding

that an inmate's "vomiting, inability to walk or stand, delirious look on his face, inability to

speak, and seizures" were obvious signs of a substantial risk of harm.  2019 WL 5586871, at *6.

The court held that a jury could find that a delay of merely forty-three minutes between the start

of the inmate's symptoms and the officers contacting EMS to be unreasonable.  *Id.*  And in

*Sealock v. Colorado*, the Tenth Circuit reversed a decision granting summary judgment when a

29

correctional officer refused to drive an inmate to the hospital after observing symptoms of heart attack. 218 F.3d 1205, 1210 (10th Cir. 2000). The court found that the denial of treatment resulted in seven hours of pain and was actionable as a deliberate indifference claim. *Id.* at 1210-11.

Here, like in *Coats* and *Sealock*, Duynes presented similarly severe symptoms of substantial risk of harm, so much so that a doctor ordered his emergency transportation to a hospital. 2019 WL 5586871, at *6; 218 F.3d at 1210-11. In the face of such a known emergency, Johnson delayed significantly longer than the officers in *Coats,* failing to put a team together for transport for over five hours. 2019 WL 5586871, at *6. Such a delay plausibly alleges deliberate indifference approaching the complete refusal to provide emergency transport in *Sealock.* 218 F.3d at 1210-11.

Therefore, the Court concludes that Plaintiff has sufficiently alleged that Captain Johnson knew of and disregarded a substantial risk of serious harm to Duynes. Accordingly, the Court finds that Plaintiff has plausibly alleged an Eighth and Fourteenth Amendment violation against each of the VDOC Defendants and will deny the VDOC Defendants' Motion to Dismiss Count III.

> b.   *The Medical Provider Defendants*

Prison medical staff must provide inmates with constitutionally adequate treatment, a standard that the mere provision of "some treatment" does not necessarily satisfy. *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013). Furthermore, like the non-medical personnel, excessively delaying treatment constitutes deliberate indifference if the delay results in substantial harm. *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). A prison medical provider who serves as a "gatekeeper for other medical personnel capable of treating the

condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *see also Estelle*, 429 U.S. at 104–05 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care.")

"Similar to the correctional officer cases, claims that a medical professional refused to treat an inmate" typically survive a motion to dismiss. *Boley*, 2022 WL 905219, at *8. For example, in *Mata*, an inmate presented for severe chest pains at the prison infirmary, and a licensed practical nurse turned her away. 427 F.3d 745, 750 (10th Cir. 2005). The nurse stated that "there was nothing she could do because the infirmary was closed" and instructed her to return in the morning. *Id.* Over the next two days, Mata's chest pain continued, and she presented to three different nurses who performed EKGs that returned normal results. *Id.* Noting a difference between two EKGs, the fourth nurse alerted a physician who ordered Mata's immediate transport to the hospital, where medical personnel determined she had suffered a heart attack causing irreversible damage. *Id.* The court found that Mata had plausibly alleged her claim by averring that the first nurse turned Mata away, thereby refusing to perform her gatekeeping role. *Id.* at 756. In contrast, the other three nurses performed their gatekeeping role, thereby defeating Mata's deliberate indifference claims. *Id.* at 759-61. In so holding, the court distinguished misdiagnosis of an inmate from refusing access or treatment. *Id.* at 758.

Merely misdiagnosing an inmate does not amount to deliberate indifference. *Johnson*, 145 F.3d at 166 ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."); *see also Sealock*, 218 F.3d at 1211 (affirming summary judgment in favor of a nurse that misdiagnosed a heart attack as the flu and failed to pass on information to a doctor); *Hinchman v. Winters*, 2011 WL

31

3205366, at *9 (N.D.W. Va. July 27, 2011) (dismissing a deliberate indifference claim where the nurse misdiagnosed the plaintiff's stroke and failed to pass on information to a doctor).

Additionally, mere provision of "some treatment" does not always suffice to defeat deliberate indifference claims. *See, e.g.*, *King v. United States*, 536 F. App'x 358, 362-63 (4th Cir. 2013) (noting that "some treatment" does not always meet the standard of "constitutionally adequate treatment"); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010), ("[A] prisoner also is not required to show that he was literally ignored."); *Gardner v. United States*, 184 F. Supp. 3d 175, 181 (D. Md. 2016) ("[A] claim arising from substandard care may be cognizable — but only in unusual circumstances, such as where the treatment provided is so cursory as to amount to no treatment at all.") (cleaned up).

> To illustrate the point, in *De'lonta*, the Fourth Circuit set out the following analogy:
>
> [I]magine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized from constitutional suit by the fact they were giving him a painkiller? We think not. Accordingly, although Appellees and the district court are correct that a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need.

708 F.3d at 526.

In *Badu v. Broadwell*, the court denied a motion to dismiss, where a doctor switched the plaintiff's prescription from a medication that had been effective to an ineffective medicine and refused for several months to re-prescribe the original medication. 2013 WL 286262, at *3, 5 (E.D.N.C. Jan. 24, 2013). The court decided that determining whether a doctor's care exceeded the "constitutional minimum" presented a better question for summary judgment. *Id.* at *5. And, in *J.F. v. Correct Care Solutions, LLC*, the court found that a plaintiff's allegation that the

32

nurse told an inmate complaining of chest pain who had a pulse of 48 to "relax and sip water" was such inadequate treatment that it could constitute deliberate indifference.  2019 WL 1057401, at *10 (D. Md. Mar. 6, 2019).  Against this backdrop, the Court turns to Plaintiff's deliberate indifference claims against the medical provider Defendants.

i.     *Nurse Semlali*

The Court finds that Plaintiff has stated a plausible claim for deliberate indifference with respect to Nurse Semlali.  Plaintiff alleges three interactions with Nurse Semlali in his final twenty-four hours that support a finding of deliberate indifference.

Plaintiff alleges that, on the morning of June 1, after taking a significant turn for the worse, several inmates assisted Duynes to the medical unit, where he presented to Nurse Semlali. (2d Am. Compl. ¶¶ 40, 42.)  Once there, Duynes was placed in a wheelchair, where he continued to cry due to pain and beg the corrections officers and medical personnel for help.  (2d Am. Compl. ¶ 41.)  Duynes complained to Nurse Semlali of nausea, vomiting, and pain rated at a level of eight out of ten.  (2d Am. Compl. ¶ 42.)  Duynes presented a bag of his vomit to the medical personnel, which tested positive for blood.  (2d Am. Compl. ¶ 42.)  Despite knowledge of Duynes' complete medical history and then-present complaints, Nurse Semlali told Duynes that "nothing was wrong."  (2d Am. Compl. ¶ 42.)  Duynes threw himself on the floor in a "last-gasp" attempt to get the Armor Correctional employees and/or agents to properly and finally take his complaints seriously and get him the proper medical treatment.  (2d Am. Compl. ¶ 42.) However, Nurse Semlali berated Duynes, baselessly telling him that nothing was wrong with him.  (2d Am. Compl. ¶ 42.)  Semlali ignored her objective knowledge of the medical emergency and discharged Duynes without providing medical treatment or diagnosis.  (2d Am. Compl. ¶¶ 42, R.)  Instead, she merely provided Duynes with over-the-counter medications that had

33

failed to provide relief in the past, including Emetrol, Tylenol and Pepto Bismol, and reminded him to drink at least eight ounces of water a day.  (2d Am. Compl. ¶ 42.)

That afternoon, after Sergeant Craft had reported his concerns to Semlali regarding Duynes' condition, Duynes returned to the medical unit via wheelchair complaining of nausea, vomiting and stomach pain rated at an eight out of ten, while sweating, nauseous and carrying another bag containing his vomit.  (2d Am. Compl. ¶¶ 47, 51.)  At last, Nurse Semlali contacted Dr. Ulep.  (2d Am. Compl. ¶ 52.)  She also kept Duynes in the medical unit for observation and administered Phenergan for his symptoms of nausea and vomiting.  (2d Am. Compl. ¶ 52.) Neither Nurse Semlali, Dr. Ulep nor any other medical personnel conducted any examination or diagnostic testing to determine the cause of Duynes' symptoms, provided any other medical treatment, or arranged transport for Duynes to go to the appropriate emergency room, even though his symptoms clearly warranted inpatient treatment by trained emergency medical staff. (2d Am. Compl. ¶ 53.)  Duynes' medical records reflect that Nurse Semlali checked on him as he lay in bed at 5:40 p.m. and that he reported vomiting twice and refused food and drink.  (2d Am. Compl. ¶ 54.)

The following morning, Nurse Semlali resumed care for Duynes after he had been recommended for emergency transport.  (2d Am. Compl. ¶¶ 61, 63.)  At 9:00 a.m., she recorded that his abdomen remained tender to the touch and that he continued to vomit a light brown liquid.  (2d Am. Compl. ¶ 63.)  At 9:16 a.m., Semlali inquired into the status of Duynes' emergency transport.  (2d Am. Compl. ¶ 64.)  At 9:53 a.m., Nurse Semlali transported Duynes to the sally port to wait on emergency transport.  (2d Am. Compl. ¶ 65.)  At 10:30 a.m., Nurse Semlali received a call from the sally port that Duynes had become unresponsive.  (2d Am. Compl. ¶ 66.)  At 10:35 a.m., Nurse Semlali arrived in the sally port to find him sitting in the

34

wheelchair, shaking. (2d Am. Compl. ¶ 67.) Nurse Semlali asked Duynes if he was okay, and

he did not respond. (2d Am. Compl. ¶ 67.) At 10:40 a.m., Nurse Semlali moved Duynes to the

floor, applied AED, and began CPR. (2d Am. Compl. ¶ 67.) She asked security to call 911, and

EMTs assumed care at 10:55 a.m., unsuccessfully administering emergency interventions for

sixteen minutes until Duynes was pronounced dead. (2d Am. Compl. ¶¶ 67-68.)

Semlali's actions plausibly reflect a "failure to respond to an inmate's known medical

needs" and thereby "raise an inference of deliberate indifference to those needs." *Scinto*, 841

F.3d at 226. Plaintiff alleges that Semlali had full "knowledge of the decedent's complete

history," his serious and immediate complaints, yet "failed to conduct any diagnostic testing or

examination" and "again provided the decedent with over-the-counter medications . . . that had

failed to provide any relief in the past." (2d Am. Compl. ¶ 42.) Indeed, Nurse Semlali allegedly

"berate[d] the decedent, telling him that nothing was wrong with him" and "merely told the

decedent to drink at least 8 ounces of water a day and sent him back to his cell." (2d Am.

Compl. ¶ 42.)

These alleged actions plausibly raise a claim of deliberate indifference "by a showing of

grossly inadequate care" demonstrated by "medical care which is so cursory as to amount to no

treatment at all." *King*, 536 F. App'x at 362 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255

(11th Cir. 1999)). Similar to the case at hand, in *McElligott*, a prisoner repeatedly requested

medical help for severe stomach pain, nausea and vomiting, but the treating medical practitioners

prescribed only pain and anti-gas medication, including Tylenol, Pepto-Bismol and Bentyl. 182

F.3d at 1252-54. After several months of insufficient treatment, the prisoner was diagnosed

with terminal stomach cancer. *Id.* at 1254. The Eleventh Circuit reversed the district court's

grant of summary judgment to the defendant medical practitioners, finding "a jury could find that

the medication provided to [plaintiff] was so cursory as to amount to no care at all." *Id.* at 1257. The *McElligott* court determined that "a jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] condition." *Id.* (internal citations omitted).

Here, beyond the factual similarity to *McElligott* in the inmate's symptoms, the medical staff's course of treatment and the fatality of the undiagnosed underlying serious medical condition, like in that case, the Court may infer deliberate indifference from the allegations that Semlali knew of the extent of Duynes' pain, knew that the prescribed course of medication had been "ineffective in the past," yet proceeded with that course of treatment. *Id.* Additionally, Semlali's determination to proceed with historically ineffective treatment mirrors the doctor's persistence in ineffective medicine for several months in *Badu.* 2013 WL 286262, at *3, 5. Moreover, Semlali's discharge of Duynes from care while telling him that nothing was wrong and reminding him "to drink at least 8 ounces of water a day" approaches the degree of inadequate treatment displayed in *J.F.* where a nurse told an inmate complaining of chest pain who had a pulse of 48 to "relax and sip water." 2019 WL 1057401, at *10. Finally, while Semlali argues that the Court must give deference to the medical provider's judgment in administering treatment, like in *McElligott*, "this case does not involve a claim that different treatment should have been provided, which is tantamount to a medical judgment call, but that the treatment provided was grossly inadequate, amounting to no treatment at all." 182 F.3d at 1259.

The Court finds that these facts, taken as true and read in a light most favorable to Plaintiff, demonstrate, at this stage, that Nurse Semlali had "actual knowledge of the risk of harm

to the inmate" and that Semlali "recognized that [her] actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Iko*, 535 F.3d at 241. Specifically, Semlali's actions, as stated in the Second Amended Complaint, plausibly reflect a "failure to respond to an inmate's known medical needs" and thereby "raise an inference of deliberate indifference to those needs." *Scinto*, 841 F.3d at 226. The Court will thus deny the Armor Defendants' Motion to Dismiss as to the deliberate indifference claim against Nurse Semlali.

*ii.*     *Dr. Ulep*

The Court finds that Plaintiff has also stated a plausible claim for deliberate indifference with respect to Dr. Ulep. Specifically, like Nurse Semlali's actions, Dr. Ulep's actions plausibly reflect a "failure to respond to an inmate's known medical needs" and thereby "raise[] an inference of deliberate indifference to those needs." *Scinto*, 841 F.3d at 226. Plaintiff alleges that, on the afternoon of June 1, 2019, Dr. Ulep became subjectively aware of Duynes' serious medical condition when Nurse Semlali contacted him during Duynes' second visit to her that day. (2d Am. Compl. ¶ 52.) In spite of this knowledge, Plaintiff alleges that Dr. Ulep utterly failed to provide any medical treatment, including ordering examination or diagnostic testing, or arranging for transport to the emergency room as "clearly warranted" by Duynes' symptoms. (2d Am. Compl. ¶ 53.)

These factual allegations, while few, also support a claim of grossly inadequate treatment, like those against Nurse Semlali. Here, the Second Amended Complaint does not describe what Nurse Semlali reported to Dr. Ulep. However, at this stage, the Court must draw all reasonable inferences in favor of Plaintiff, *Iqbal*, 556 U.S. at 679, and the fact that Semlali contacted Dr. Ulep in the context of having seem Duynes twice that day when he was presenting with nausea, severe stomach pain, a bag of vomit containing blood and unable to walk, support a

37

reasonable inference that Dr. Ulep then became subjectively aware of Duynes' serious medical need. Plaintiff avers that Dr. Ulep then completely failed to respond, thereby "mak[ing] out a prima facie case of deliberate indifference." *Scinto*, 841 F.3d at 226. The allegations against Dr. Ulep resemble those of the nurse in *Mata* who abdicated her gatekeeping duty and turned the inmate away without providing any diagnostic testing or treatment whatsoever. 427 F.3d at 750.

The Court finds that these facts, taken as true and read in a light most favorable to Plaintiff, demonstrate, at this stage, that Dr. Ulep had "actual knowledge of the risk of harm to the inmate" and that Ulep "recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Iko*, 535 F.3d at 241. Of course, the evidence may yet belie these factual allegations, but Plaintiff has sufficiently pleaded her claim against Dr. Ulep to survive the motion to dismiss. Therefore, the Court will deny the Armor Defendants' Motion to Dismiss as to the deliberate indifference claim against Dr. Ulep.

### iii.    Nurse Sykes

The Court finds that Plaintiff has stated a plausible claim for deliberate indifference with respect to Nurse Sykes. Plaintiff describes four interactions with Nurse Sykes while she tended to him during the night before his death. After having been retained for observation by Nurse Semlali on June 1, 2019, Nurse Sykes assumed care of Duynes for the overnight shift. (2d Am. Compl. ¶ 55.) At approximately 11:26 p.m., Duynes reported to her another episode of vomiting and continued abdominal pain. (2d Am. Compl. ¶ 55.) Nurse Sykes reviewed Duynes' medical records and personally observed him, making her aware of his condition. (2d Am. Compl. ¶ 55.) Nurse Sykes noted that Duynes' stomach was tender to the touch and that he described belching and flatulence with pain rated at an eight out of ten. (2d Am. Compl. ¶ 56.) Sykes merely provided Duynes with over-the-counter Tylenol, making no attempt to treat him under

circumstances that warranted treatment by a medical facility with emergency medical staff, or at the very least, attempt to otherwise alleviate his pain and suffering. (2d Am. Compl. ¶ 56.)

Twice more that night, Nurse Sykes checked on Duynes. (2d Am. Compl. ¶¶ 57-60.) At approximately 1:36 a.m. on June 2, 2019, Nurse Sykes noted that Duynes lay on his bed with a towel over his eyes and that she could not awaken him. (2d Am. Compl. ¶ 57.) By 3:15 a.m., Duynes had awakened and reported to Nurse Sykes another episode of vomiting and an increase in abdominal pain to a level of ten out of ten. (2d Am. Compl. ¶¶ 58-59.) Nurse Sykes recorded that Duynes appeared noticeably uncomfortable and easily agitated, shifted his weight, closed his eyes even when speaking and held his abdomen. (2d Am. Compl. ¶ 59.) Nurse Sykes merely provided Duynes with medications including Bentyl, Tylenol, and Phenergan, none of which had alleviated his symptoms in the past. (2d Am. Compl. ¶ 59.) Despite making note of her subjective knowledge of Duynes' deteriorating medical condition, Defendant Sykes made no effort to treat him nor arrange transport to the hospital, which his condition clearly warranted. (2d Am. Compl. ¶ 60.)

At 5:00 a.m., after six hours of observing Duynes, Nurse Sykes finally notified a doctor of his deteriorating condition. (2d Am. Compl. ¶¶ U, 61.) Sykes reported that Duynes' abdomen proved tender to the touch and that he experienced a pain level of ten out of ten, continued nausea and inability to have a bowel movement even though he tried. (2d Am. Compl. ¶ 61.) Hearing this, the medical doctor immediately recommended Duynes' transport to MCV Emergency Room via a security van. (2d Am. Compl. ¶ 61.) Nurse Sykes notified the watch commander, Captain Johnson, of the doctor's order at 5:10 a.m. (2d Am. Compl. ¶ 61.) When Sykes finished her shift, Duynes still awaited emergency transport. (*See* Second Am. Compl. ¶ 63 (noting Nurse Semlali had resumed care by 9:00 a.m.).)

Taking Plaintiff's properly pleaded allegations as true and drawing all reasonable inferences in her favor, she has stated a plausible claim of deliberate indifference against Nurse Sykes due to her delay in fulfilling her gatekeeping role. *Mata*, 427 F.3d at 751. In her first interaction, like Nurse Semlali, Nurse Sykes, with actual knowledge of Duynes' deteriorating condition, continued in providing over-the-counter medication that had not provided relief and proved "so cursory as to amount to no treatment at all." *King*, 536 F. App'x at 362. A few hours later, Sykes recorded that she found Duynes with a towel over his eyes and that she could not awaken him. The Court finds that this allegation gives rise to a reasonable inference that Duynes had become unconscious or unresponsive due to his serious medical condition — a condition that rendered him unresponsive and caused his death a few hours later. Yet, Sykes did not then contact a doctor. Nor did she contact a doctor after her third interaction when Duynes reported an increase in pain level to ten out of ten, described an additional episode of vomiting and visibly appeared in a heightened state of agitation. Instead, she again provided Duynes with medications that she knew had not alleviated his symptoms in the past. Only after Sykes' fourth interaction with Duynes, approximately four hours after Duynes had appeared unresponsive, and two hours after he reported worsening symptoms, did she contact a doctor, who immediately recommended that he be transported to MCV Emergency Room via security van.

These facts plausibly allege that Nurse Sykes delayed in fulfilling her gatekeeper role, thereby "caus[ing] either unnecessary pain or a worsening of [Duynes'] condition." *Mata*, 427 F.3d at 755. "Even a brief delay may be unconstitutional." *Id.* Nurse Sykes' delay of approximately four hours in contacting a doctor proves comparable to the delay of several hours in taking an inmate with chest pains to the hospital in *Sealock*, which the Tenth Circuit found unconstitutional. There, the court reversed and remanded a grant of summary judgment to the

40

medical provider, "conclud[ing] that *if* Havens knew that appellant had unexplained chest pain, it would have been more than mere 'malpractice' or 'negligence' to fail to call an ambulance." *Sealock*, 218 F.3d at 1211. And Nurse Sykes' delay certainly exceeds that of the officers in *Coats*, where the court denied summary judgment, finding that a jury could find unreasonable a delay of just forty-three minutes between the observation of the inmate's symptoms of "vomiting, inability to walk or stand, delirious look on his face, inability to speak, and seizures" and contacting EMS. 2019 WL 5586871, at *6.

The Court finds that these facts, taken as true and read in a light most favorable to Plaintiff, demonstrate, at this stage, that Nurse Sykes had "actual knowledge of the risk of harm to the inmate" and that Sykes "recognized that [her] actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Iko*, 535 F.3d at 241. Specifically, Sykes' actions, as stated in the Second Amended Complaint, plausibly reflect a "failure to respond to an inmate's known medical needs" and thereby "raise an inference of deliberate indifference to those needs." *Scinto*, 841 F.3d at 226. The Court will thus deny Nurses Sykes' and Walker's Motion to Dismiss as to the deliberate indifference claim against Nurse Sykes.

iv.    Dr. Picio

The Court finds that Plaintiff fails to state a plausible claim for deliberate indifference with respect to Dr. Picio. Plaintiff describes only one interaction with Dr. Picio in the course of his incarceration at Sussex I. On October 16, 2018, Duynes first reported his stomach pain, then an extreme ten out of ten, to Nurse Walker, who administered over-the-counter medication and recorded that Duynes needed examination from a doctor. (2d Am. Compl. ¶ 20.) Six days later, having reviewed Nurse Walker's notes, "noting that the decedent presented with persistent, intermittent right upper quadrant abdominal pain, and epigastric tenderness to palpation," Dr.

41

Picio examined Duynes. (2d Am. Compl. ¶¶ 21-22.) Duynes "complained of right upper quadrant abdominal pain," and Dr. Picio "misdiagnosed [Duynes] with indigestion." (2d Am. Compl. ¶ 22.)

As previously discussed, merely misdiagnosing an inmate does not amount to deliberate indifference. *Johnson*, 145 F.3d at 166 ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."). Indeed, even taking the facts alleged as true and reading them in the light most favorable to Plaintiff, the allegation that Dr. Picio "misdiagnosed" Duynes proves fatal to Plaintiff's claim without more. This allegation concedes that Dr. Picio did not have actual knowledge of Duynes' condition, an essential element of a deliberate indifference claim. *Id.* at 167.

"A prison official is not liable if he 'knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Id.* (quoting *Farmer,* 511 U.S. at 844). For example, in *Johnson*, a prison doctor failed to diagnose an inmate's pituitary tumor, which ultimately caused him to go blind, despite having full knowledge of the inmate's symptoms from having examined the inmate on seventeen occasions. *Id.* at 165-66. However, the Fourth Circuit found such allegations did not amount to deliberate indifference, concluding that the plaintiff "needed to produce evidence that the doctors actually drew the inference between the symptoms and the tumor" and correctly diagnosed the plaintiff. *Id.* at 166. Here, like in *Johnson*, Plaintiff's claim fails, because she "has produced no evidence that the doctor[] subjectively knew about the [underlying condition] and deliberately failed to treat it." *Id.* at 168.

While "claims that a medical professional refused to treat an inmate" typically survive a motion to dismiss, *Boley*, 2022 WL 905219, at *8, Plaintiff has not plausibly established such a case here. Plaintiff avers that Dr. Picio "failed to facilitate or administer medical treatment, failed to order any diagnostic testing or imaging to determine the cause of the decedent's excruciating pain, or order that Duynes be transported to an appropriate outside medical facility equipped to treat his medical condition." (2d Am. Compl. ¶ 22.) However, these allegations are contrary to Dr. Picio's notes documenting the October 22, 2018 visit, which Plaintiff attached to her Amended Complaint.[4] (Ex. B at 1 (ECF No. 42-2).) While not fully legible in their handwritten form, the notes clearly establish that Dr. Picio took Duynes' vitals, recorded his subjective complaints, extensively noted his objective assessments, diagnosed Duynes with dyspepsia, prescribed him Prilosec and noted a follow-up plan.[5] (Ex. B. at 1.) Accordingly, Dr. Picio clearly did not refuse to treat Duynes.

The Court notes that the context of this visit distinguishes Dr. Picio's treatment from that of Nurses Semlali and Sykes. Here, Duynes presented to Dr. Picio on October 16, 2018, for his first follow-up visit, a mere six days after he reported his symptoms for the first time. Dr. Picio assessed and misdiagnosed Duynes, prescribing him Prilosec for his symptoms. In contrast,

---

[4]     Where the bare allegations of the complaint conflict with any document incorporated therein, the document prevails. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). Because Plaintiff incorporated Dr. Picio's notes by attaching them to her Amended Complaint, his notes prevail over her allegation that Picio "failed to facilitate or administer medical treatment."

[5]     Dr. Picio attached a typed transcription of his handwritten notes to his Memorandum in Support of his Motion to Dismiss, as well as an affidavit of their accuracy. (ECF No. 50-1.) However, the Court does not rely on the transcription at this stage, because, as Plaintiff notes in her response in opposition, its accuracy has not been tested in discovery. (Resp. Opp'n Picio Mot. at 15.) Nonetheless, the Court finds the handwritten notes constituting a part of Plaintiff's pleading sufficiently legible to support the Court's finding that they contradict Plaintiff's conclusory assertion that Dr. Picio failed to facilitate or administer any medical treatment.

Nurses Semlali and Sykes assessed Duynes nearly eight months later and provided Duynes with over-the-counter medicine that had proven ineffective in that course of time. Accordingly, the context and timing of their care renders it "so cursory as to amount to no treatment at all," *King*, 536 F. App'x at 362, as opposed to Dr. Picio's untested treatment plan and diagnosis made without actual knowledge of Duynes' underlying medical condition.

Accordingly, Plaintiff has not met the subjective prong of her deliberate indifference claim against Dr. Picio, because she fails to plausibly allege his subjective knowledge of Duynes' underlying condition and that he deliberately failed to treat it. *Johnson*, 145 F.3d at 168. Therefore, the Court will grant Dr. Picio's Motion to Dismiss as to the deliberate indifference claim.

### 2.     Supervisory Liability

Plaintiff also raises a claim for deliberate indifference against Sergeant Craft, Sergeant Norris, Captain Johnson, Dr. Patel, Dr. Ulep and Dr. Picio (the "Supervisory Defendants") under a theory of Supervisory Liability. The Court finds that Plaintiff has failed to plausibly allege a claim for supervisory liability in Count IV of her Amended Complaint.[6] In the Fourth Circuit, a claim for supervisory liability under § 1983 requires that a plaintiff plausibly allege three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response

---

[6]     Although Dr. Patel has not appeared in this case or moved to dismiss the Complaint, the Court finds Count IV completely lacking in its failure to allege that the risk Duynes faced proved "pervasive and unreasonable," and so will dismiss *sua sponte* the claim against Dr. Patel as well. *See Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 565 n.5 (E.D. Va. 2020) ("Although Brooks has not filed any responsive pleadings or motions, the Courts finds no distinguishing facts between Brooks's role as an agent of the Authority and the roles held by Townsend and Brown. Therefore, Brooks enjoys the same sovereign immunity as Townsend and Brown.")

to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

The first element requires a plaintiff to show that "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (quoting *Slakan,* 737 F.2d at 373-74).   Under the second element, a "plaintiff assumes a heavy burden of proof in establishing deliberate indifference" and must establish that the supervisor failed to act "in the face of documented widespread abuses." *Id.* (citing *Miltier,* 896 F.2d at 848)  The third element requires the plaintiff to demonstrate an "affirmative causal link," encompassing cause in fact and proximate cause, between the supervisor's inaction and the harm suffered by the plaintiff. *Id.*

In the context of this case, to meet *Shaw's* test, Plaintiff must plausibly allege that the Supervisory Defendants "knew, or should have known, that their subordinates routinely ignored the [medical] needs of inmates, and that the supervisors' subsequent response to these offenses — if any — proved glaringly insufficient." *Dowdy v. Pamunkey Reg'l Jail Auth.*, 2014 WL 2002227, at *8 (E.D. Va. May 15, 2014).   Plaintiff falls short of meeting her "heavy burden" to allege supervisory liability. *Shaw*, 13 F.3d at 799.   Here, Plaintiff alleges that Duynes complained "of pain and serious symptoms for [eight] months," filing several grievances and requesting that his family members call the prison to advocate on his behalf, while his serious,

45

ongoing condition went undiagnosed and untreated.  (2d Am. Compl. ¶ 121.)  Plaintiff

summarily alleges that the defendants named in Count IV have supervisory responsibilities and

had knowledge of their subordinates' conduct that posed a risk of constitutional injury to citizens

like Plaintiff.[7]  (2d Am. Compl. ¶ 120.)

       Plaintiff's Second Amended Complaint utterly fails to allege that the Supervisory

Defendants knew, or had reason to know, of "pervasive and unreasonable" conduct on the part of

their subordinates at the jail.  "Establishing a 'pervasive' and 'unreasonable' risk of harm

requires evidence that the conduct is widespread, or at least has been used on several different

occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm

of constitutional injury."  *Id.*  Accordingly, Plaintiff must allege an unreasonable risk of harm

that impacts "an identifiable group of prisoners."  *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.

1980) *abrogated on other grounds by Moore v. Winebrenner*, 927 F.2d 1312 (4th Cir. 1991).

       However, conspicuously absent from the Second Amended Complaint are other incidents

of VDOC and Armor staff ignoring serious medical needs of other identifiable inmates and

allegations that the Supervisory Defendants had knowledge of such risks of constitutional injury.

Plaintiff solely relies on Duynes' isolated experience to establish that he faced a pervasive and

unreasonable risk of constitutional injury and that the Supervisory Defendants had knowledge of

such risk.  Thus, without plausibly alleging "pervasive and unreasonable conduct" of the

Supervisory Defendants' unidentified subordinates, Plaintiff's allegations fail to state a claim for

supervisory liability.  *See Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) ("[Plaintiff] cannot

---

[7]     While Plaintiff details additional individual instances of these Defendants' knowledge of
Duynes' condition and their insufficient response, these allegations go to their direct liability for
deliberate indifference, analyzed *supra*, rather than their liability for their tacit authorization of
their subordinates' constitutionally injurious behavior.  (Am. Compl. ¶ 122; Resp. Opp'n VDOC
Mot. at 25-26.)

satisfy his burden of proof by pointing to a single incident or isolated incidents," but must show "[a] supervisor's continued inaction in the face of documented widespread abuse.") Therefore, the Court will grant the motions to dismiss Count IV of the Second Amended Complaint.

### 3.     Failure to Train

Plaintiff's final claim for deliberate indifference proceeds against the Supervisory Defendants under a theory of failure to train, supervise, and control. Like Count IV, the Court finds that Count V proves completely deficient, as Plaintiff has failed to plausibly allege a claim pattern of constitutional violations.[8]

Liability for failure to properly train subordinates follows the same well-established rubric as other claims under section 1983. Fourth Circuit caselaw predominantly addresses instances of failure to train police or other law enforcement officers, but unequivocally requires that the alleged failure to train to "amount to deliberate indifference to the rights of person with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Of course, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). "To present a viable failure to train claim, there ordinarily must be a pattern of constitutional violations to prove deliberate indifference." *Thomas v. Walthall*, 2020 WL 7074145, at *4 (E.D. Va. Dec. 2, 2020) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Without notice that a course of training is deficient in a

---

[8]     As with Count IV, although Dr. Patel has not yet appeared in this case, the Court finds Count V so completely lacking in its failure to allege a pattern of constitutional violations that it will dismiss *sua sponte* the claim against Dr. Patel as well. *See Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 565 n.5 (E.D. Va. 2020) ("Although Brooks has not filed any responsive pleadings or motions, the Courts finds no distinguishing facts between Brooks's role as an agent of the Authority and the roles held by Townsend and Brown. Therefore, Brooks enjoys the same sovereign immunity as Townsend and Brown.")

particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

Here, Plaintiff's Amended Complaint fails to meet basic pleading requirements. Plaintiff has alleged no facts in support of her failure-to-train claim. Instead, she asserts the bald conclusions that Craft, Norris, Johnson, Patel, Ulep and Picio: "had a duty to properly hire, train, supervise, and fire, if necessary" their employees (2d Am. Compl. ¶ 130); "failed to effectively train, supervise, and control" their employees regarding access to adequate medical care and transportation to emergency medical facilities (2d Am. Compl. ¶ 131); "had a policy, custom, and/or practice of failing to effectively train" their employees (2d Am. Compl. ¶ 132); "knew or should have known" that their employees "required adequate training on the proper administration of medical care" (2d Am. Compl. ¶ 133); "violated their duty in failing to properly train" their employees "on the proper administration of medical care" (2d Am. Compl. ¶ 134); "demonstrated a deliberate indifference to the need to provide proper training . . . especially in light of the repeated grievances filed, family member complaints lodged, and inmate complaints lodged, as set out above" (2d Am. Compl. ¶ 135); thereby directly and proximately causing a violation of Duynes' constitutional rights (2d Am. Compl. ¶ 136). Those, of course, constitute the exact type of "labels and conclusions and a formulaic recitation of the elements of a cause of action" that *Twombly* says "will not do." 550 U.S. at 555.

While a plaintiff "need not identify in detail the exact training policies in effect, or lack thereof, at the time of the events in question," *Lee v. City of Richmond*, 2013 WL 1155590, at *7 (E.D. Va. Mar. 19, 2013), she cannot properly support a failure to train claim "by merely alleging that the existing training program for a class of employees . . . represents a policy for which the city is responsible." *City of Canton*, 489 U.S. at 389. As with her supervisory liability

claim, Plaintiff merely alleges the isolated incident of Duynes' insufficient medical care and has failed to allege any, much less sufficient, facts to plausibly establish a pattern of constitutional violations, that the pattern resulted from any insufficient training, that any of the Supervisory Defendants actually held supervisory duties over specified employees, or that any of the Supervisory Defendants held responsibility for any insufficient training. Plaintiff's bald allegations in Count V "are not entitled to the presumption of truth." *Griffin v. Mortier*, 837 F. App'x 166, 172 (4th Cir. 2020) (affirming dismissal of failure to train claim where the allegations "consist[ed] of naked assertions that the Sheriff of Buncombe County failed to train and implement proper policies"). Because Plaintiff's allegations fail to state a claim for failure to train liability, the Court will grant the motions to dismiss Count V of the Second Amended Complaint.

### B.  Gross Negligence

For the same reasons that Plaintiff has adequately stated a claim for deliberate indifference, the Court finds that Plaintiff has adequately alleged a claim for Gross Negligence against Sergeant Craft, Corrections Officer Moss, Sergeant Norris, Captain Johnson, Dr. Ulep, Nurse Semlali and Nurse Sykes. Additionally, the Court finds that Plaintiff has plausibly alleged a claim for gross negligence against Armor under a theory of *respondeat superior* liability. However, the Court finds that the allegations fail to state a claim for gross negligence as to Dr. Picio.

Virginia recognizes three degrees of negligence, listed here in descending order of severity: (1) willful or wanton negligence, which is roughly equivalent to the subjective component of deliberate indifference; (2) gross negligence; and (3) simple or ordinary negligence. *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918-19 (Va. 2004); *see*

49

*Boley*, 2022 WL 905219, at \*12 ("The definition of willful and wanton negligence nearly mirrors the subjective prong of the deliberate indifference test.") (cleaned up).  The Supreme Court of Virginia has defined gross negligence as "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (quoting *Cowan*, 603 S.E.2d at 918). It requires "a degree of negligence that would shock fair-minded persons." *Doe v. Baker*, 857 S.E.2d 573, 587 (Va. 2021) (quoting *Cowan*, 603 S.E.2d at 918)).  The standard is one of "indifference, not inadequacy." *Fijalkowski v. Wheeler*, 801 F. App'x 906, 914 (4th Cir. 2020) (citing *Elliott*, 791 S.E.2d at 732).  A claim for gross negligence "must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.*

Further, "a claim for gross negligence under Virginia law requires a lesser showing of recklessness than a claim for deliberate indifference under the Eighth and Fourteenth Amendments." *Hixson v. Hutcheson*, 2018 WL 814059, at \*6 (W.D. Va. Feb. 9, 2018); *Coppage v. Mann*, 906 F. Supp. 1025, 1049 (E.D. Va. 1995).  "The key difference is that in a gross negligence case, the plaintiff does not have to establish that the defendant subjectively knew of a substantial risk." *Boley*, 2022 WL 905219, at \*10.  Instead, the plaintiff must show that the defendant *should have known* the substantial risk existed. *Coppage*, 906 F. Supp. at 1049 ("Unlike deliberate indifference, gross negligence does not require a juror to find that Dr. Mann subjectively knew of a substantial risk; it is enough that Dr. Mann should have been aware of that risk.").  Accordingly, where the Court has already found that Plaintiff has plausibly alleged a claim for deliberate indifference against a particular defendant, she has also sufficiently pleaded a claim for gross negligence. *Rucker v. Piedmont Reg'l Jail Auth.*, 2021 WL 3863346, at \*8 (E.D. Va. Aug. 30, 2021) ("Because the Court has already determined that Plaintiff has stated a

claim for deliberate indifference, the Court concludes that he has likewise stated a claim for gross negligence against these Defendants."); *Sams*, 2020 WL 5835310, at *31; *Boley*, 2022 WL 905219, at *11.

### 1.    Time Bar

The VDOC Defendants first argue that Virginia's one-year statute of limitations for claims relating to an inmate's conditions of confinement bars Plaintiff's gross negligence claim against them.[9] (Mem. Supp. VDOC Mot. at 17-18.) Plaintiff argues that the two-year statute of limitations of the Virginia Wrongful Death statutes, Virginia Code § 8.01-50 *et seq.*, and the Virginia Tort Claims Act, Virginia Code § 8.01-195.1 *et seq.*, govern her negligence claims. (Resp. Opp'n VDOC Mot. at 18-19.) While Plaintiff's cause of action accrued at the time of Duynes' death, on June 2, 2019, more than one year before she filed her case, on June 1, 2021, the appropriate statute of limitations does not bar Plaintiff's claims.

The Court finds that the two-year statute of limitations for wrongful death governs Plaintiff's claims. The Supreme Court of Virginia has held that "a statute of limitations incorporated into a self-contained act," such as the wrongful death statute and Virginia Tort Claims Act, "applies despite the existence of a generally applicable statute of limitations," such as the conditions of confinement statute. *Reid v. Newton*, 2014 WL 1493569, at *12 (E.D. Va.

---

[9]    Virginia Code § 8.01-243.2 provides:

> No person confined in a state or local correctional facility shall bring or have brought on his behalf any personal action relating to the conditions of his confinement until all available administrative remedies are exhausted. Such action shall be brought by or on behalf of such person within one year after cause of action accrues or within six months after all administrative remedies are exhausted, whichever occurs later.

Apr. 14, 2014) (citing *Ogunde v. Commonwealth,* 628 S.E.2d 370, 373 (Va. 2006)). Indeed,

Virginia's wrongful death statute and the Virginia Tort Claim Act incorporate their own two-

year statute of limitations.[10]  Further, Virginia's wrongful death statute "applies even when the

wrongful death claim concerns [an inmate's] conditions of confinement." *Reid*, 2014 WL

1493569, at *12.  The Supreme Court of Virginia has held that a statute of limitations generally

applicable to personal actions "was never intended to apply to a right of action for death by

wrongful act." *Horn v. Abernathy*, 343 S.E.2d 318, 324 (Va. 1986) (distinguishing between the

"right of action" created by Virginia's wrongful death statute and a "personal action").  The

statute of limitations urged by the VDOC Defendants applies to "personal action[s]" brought on

behalf of confined persons.  Va. Code Ann. § 8.01-243.2.  This one-year statute of limitations

applies to "actions seeking damages for personal injuries when the victim is the party-plaintiff or

when the victim's death results from a cause unrelated to the tort underlying the cause of

action." *Horn*, 343 S.E.2d at 324.  It does not, however, apply to wrongful death actions. *Id.*

     The VDOC Defendants argue that Plaintiff did not bring her gross negligence claim

under the Virginia wrongful death statute, because she omitted the term "wrongful death" from

---

[10]    Virginia's wrongful death statute provides:

    Every action under § 8.01-50 shall be brought by the personal representative of the
    decedent within two years after the death of the injured person.

    Va. Code Ann. § 8.01-244.

    Providing a similar two-year statute of limitations, the Virginia Tort Claims Act
states:

    All claims against the Commonwealth or a transportation district under this article
    shall be forever barred unless such action is commenced within 18 months of the
    filing of the notice of claim, or within two years after the cause of action accrues.

    Va. Code Ann. § 8.01-195.7.

the caption of that count. (Reply VDOC Mot. at 6-7 (ECF No. 61).) The VDOC Defendants compare the caption of Count II to that of the ordinary negligence count, Count I, which does include the term "wrongful death" to argue that she "knew how to bring a wrongful death claim" but did not in Count II. (Reply VDOC Mot. at 6-7.)

However, the Court will not so strictly construe Plaintiff's Amended Complaint to knock Count II out on such a technicality. *Cf. Mylan Lab'ys, Inc.*, 7 F.3d at 1134 ("In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff.") Indeed, the contents of the Second Amended Complaint clearly implicate the wrongful death statute and put the VDOC Defendants on notice of Plaintiff's claims against them for gross negligence resulting in death. In the introductory paragraphs of her Amended Complaint, Plaintiff asserts that she brings suit "pursuant to 42 U.S.C. § 1983; the Virginia Wrongful Death Statute, Va. Code § 8.01-50 *et seq.*; the Virginia Tort Claims Act, Va. Code § 8.01-195.1 *et seq.*; and Virginia common and statutory law." (2d Am. Compl. ¶ 13.) In Count I, she pleads a claim of negligence resulting in the death of Duynes, and includes the term "wrongful death" in the caption. (2d Am. Compl. ¶¶ V, 89 ("As a direct and proximate result of omissions and negligence of CRAFT, MOSS, NORRIS, and JOHNSON, the decedent died on June 2, 2019, without any medical treatment or diagnostic testing having been administered.").) In Count II, she similarly pleads a claim of gross negligence resulting in the death of Duynes, but fails to include the term "wrongful death" in the caption. (2d Am. Compl. ¶¶ VI, 101 ("As a direct and proximate result of the defendants' gross negligence, the decedent died on June 2, 2019.").) Such an omission does not undermine the fact that she pleaded a claim of gross negligence resulting in wrongful death. *Cf. Cubbage v. Piedmont Reg'l Jail Auth.*, 2018 WL 4040231, at *1 (E.D. Va. Aug. 23, 2018) (finding

conditions of confinement statute of limitations barred gross negligence claim brought by administratrix of inmate decedent's estate where "the Complaint does not identify this as a wrongful death action and contains no citation to the Virginia wrongful death statute.").

"A wrongful death claim is the vehicle for a posthumous negligence claim." *Darlington v. Harbour E. Vill. LLC*, 2020 WL 3979664, at *4 (E.D. Va. July 14, 2020), *appeal dismissed*, 2020 WL 8465466 (4th Cir. Nov. 17, 2020) (citing *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) ("Virginia's wrongful death statute does not create a new cause of action, but only a right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death.")). Virginia law "entitles a decedent's personal representative to file a motion for judgment seeking damages for personal injuries sustained by the decedent; however, if the injuries cause death, the recovery must be sought under Code § 8.01-50, the wrongful death statute." *Lucas v. HCMF Corp.*, 384 S.E.2d 92, 94 (Va. 1989).

Accordingly, the Court construes Count II as a wrongful death claim, and finds that the two-year statute of limitations codified in Virginia Code § 8.01-244 apply to this action. The Court finds the Virginia Tort Claims Act inapposite, because, although Plaintiff cites the Act and its notice requirements, (2d Am. Compl. ¶¶ 13, 15), Plaintiff has not sued the Commonwealth. *The Rector and Visitors of the Univ. of Va. v. Carter*, 591 S.E.2d 76, 78 (Va. 2004) (holding that the Commonwealth of Virginia was a necessary party to a Virginia Tort Claims Act claim). Moreover, even if she had, the Act reserves exclusive jurisdiction for Virginia Tort Claims Act suits to Virginia state courts. Va. Code Ann. § 8.01-195.4; *see also Creed v. Virginia*, 596 F. Supp. 2d 930, 938 (E.D. Va. 2009) ("The VTCA explicitly limits jurisdiction over claims brought under the Act to Virginia courts."). Because Plaintiff filed suit on June 1, 2021, less

than two years after her claims accrued with Duynes' death on June 2, 2019, the statute of limitations does not bar Count II.

### 2.    Sufficiency of the Allegations

Again, "a claim for gross negligence under Virginia law requires a lesser showing of recklessness than a claim for deliberate indifference under the Eighth and Fourteenth Amendments." *Hixson*, 2018 WL 814059, at *6. Thus, because the Court has found that Plaintiff has pleaded a plausible claim for deliberate indifference against Sergeant Craft, Corrections Officer Moss, Sergeant Norris, Captain Johnson, Dr. Ulep, Nurse Semlali and Nurse Sykes, the Court finds that she has also pleaded a plausible claim for gross negligence against these defendants as well. Accordingly, the Court will deny the motions to dismiss the gross negligence claims against them. The Court proceeds to assess the remaining gross negligence claims against Dr. Picio and Armor.

#### a.    Dr. Picio

The Court finds that Plaintiff has failed to state a claim for gross negligence against Dr. Picio. As stated, a claim for gross negligence "must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Fijalkowski*, 801 F. App'x at 914; *Elliott*, 791 S.E.2d at 732. Here, the facts show that Dr. Picio exercised some degree of care during his only interaction with Duynes when he treated him on October 22, 2018.

As discussed above, that day, Dr. Picio examined Duynes, six days after Duynes first reported his stomach pain. (2d Am. Compl. ¶¶ 21-22.) Duynes "complained of right upper quadrant abdominal pain" and Dr. Picio "misdiagnosed [Duynes] with indigestion." (2d Am. Compl. ¶ 22.) While Plaintiff avers that Dr. Picio "failed to facilitate or administer medical treatment, failed to order any diagnostic testing or imaging to determine the cause of the

decedent's excruciating pain, or order that Duynes be transported to an appropriate outside medical facility equipped to treat his medical condition," (2d Am. Compl. ¶ 22), these allegations prove contradicted by Dr. Picio's notes documenting the examination, which Plaintiff attached to her Amended Complaint.  (Ex. B at 1.)  Though not fully legible in their handwritten form, the notes clearly establish that Dr. Picio took Duynes' vitals, recorded his subjective complaints, extensively noted his objective assessments, diagnosed Duynes with dyspepsia, prescribed him Prilosec and detailed a follow-up plan.  (Ex. B. at 1.)

Although Dr. Picio misdiagnosed Duynes, his examination and treatment does not evince a "heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care."  *Volpe v. City of Lexington*, 708 S.E.2d 824, 828 (Va. 2011).  Rather, Dr. Picio's treatment shows "some degree of care," sufficient to thwart Plaintiff's claim of gross negligence.  As such, the Court will grant Dr. Picio's Motion to Dismiss as to the gross negligence claim against him.

> b.    *Armor*

Plaintiff has successfully stated a claim for gross negligence against Armor under the theory of *respondeat superior*.  "Under Virginia's doctrine of *respondeat superior*, 'an employer is liable for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed.'"  *Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 235 (4th Cir. 2018) (quoting *Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 173 (Va. 1996)).  "At the motion to dismiss stage, the plaintiff must state a *prima facie* case that the employee acted within the scope of their employment when the act which caused the injury was committed . . . by establishing the

56

employer-employee relationship at the time." *Sams*, 2020 WL 5835310, at \*33 (citing *Majorana v. Crown Cent. Petroleum Corp.*, 539 S.E.2d 426, 428-29 (Va. 2000) (cleaned up).

Plaintiff has plausibly alleged a *prima facie* "employer-employee relationship" between Armor and Dr. Ulep, Nurse Semlali, and Nurse Sykes at the time "the act[s] which caused [Duynes'] injury [were] committed." *Id.* Plaintiff states that Ulep, Semlali and Sykes, "[a]t all times relevant to this Complaint, . . . were duly appointed and actively employed as doctors, nurses, licensed practitioners, and/or trained medical personnel, each acting within the scope of their employment, agency, and servitude for [Armor]." (2d Am. Compl. ¶ 8.) Ulep, Semlali and Sykes' conduct in relation to Duynes fell within their duties as Armor employees "tasked with maintaining the health and welfare of the inmates in custody of Sussex I State Prison, and specifically the decedent, at the time of the subject unconstitutional acts and/or omissions." (2d Am. Compl. ¶ 73.)

Considering these allegations, Plaintiff has plausibly stated a *prima facie* case that Armor had an "employer-employee relationship at the time . . . the act[s] which caused the injury [were] committed" with Ulep, Semlali, and Sykes. *Sams*, 2020 WL 5835310, at \*33 (citing *Majorana*, 539 S.E.2d at 428-29 (cleaned up). As such, Virginia law holds Armor responsible for Plaintiff's claims of gross negligence against Ulep, Semlali and Sykes under a theory of *respondeat superior*. The Court will therefore deny the Armor Defendants' Motion to Dismiss as to Count X, the gross negligence claim against Armor.

### C.    Negligence

The Court finds that Plaintiff has plausibly alleged a claim for ordinary negligence against Dr. Picio and Nurse Walker, the only medical provider defendants moving to dismiss Count VI. However, the Court finds that sovereign immunity protects Sergeant Craft,

Corrections Officer Moss, Sergeant Norris and Captain Johnson from Plaintiff's claim for ordinary negligence against them.

To plead a basic negligence claim in Virginia, a plaintiff must plausibly allege "the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage." *Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003). Simple negligence "involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." *Cowan*, 603 S.E.2d at 918.

### 1.    Sovereign Immunity

The VDOC Defendants raise sovereign immunity as a defense to Plaintiff's negligence claim against them. Indeed, "[t]he doctrine of sovereign immunity protects the state from liability for claims of negligence asserted against it." *Coppage*, 906 F. Supp. at 1047. "Because a state acts through its employees, the sovereign immunity doctrine extends to public employees as well." *Id.* Thus, in Virginia, individuals that work for an immune government entity, such as a state agency like the VDOC, "may invoke the Commonwealth's sovereign immunity with respect to claims of simple negligence so long as the challenged conduct consisted of 'acts of judgment and discretion which are necessary to the performance of essential governmental functions.'" *Riddick v. Watson*, 503 F. Supp. 3d 399, 426 (E.D. Va. 2020) (quoting *Heider v. Clemons*, 400 S.E.2d 190, 191 (Va. 1991)) (cleaned up). Although, under the Virginia Tort Claims Act, the Commonwealth has "waived its immunity from negligence suits against the Commonwealth itself, it has explicitly retained 'the individual immunity of . . . public officers, their agents and employees from tort claims for damages . . . .'" *Coppage*, 906 F. Supp. at 1047 (quoting Va. Code Ann. § 8.01–195.3). Even still, sovereign immunity only bars claims for

ordinary negligence; "acts constituting gross negligence or intentional torts are not immunized." *Id.* (citing *James v. Jane*, 282 S.E.2d 864, 869 (Va. 1980)).

The Supreme Court of Virginia has set out a four-factor "test to determine entitlement to immunity." *Messina v. Burden*, 321 S.E.2d 657, 663 (Va. 1984). Accordingly, a court must consider: (1) "the nature of the function performed by the employee," (2) "the extent of the state's interest and involvement in the function," (3) "the degree of control and direction exercised by the state over the employee," and (4) "whether the act complained of involved the use of judgment and discretion." *Id.* (citing *James*, 282 S.E.2d at 869.) Here, the applicability of sovereign immunity, "as is often the case, turns on the fourth factor — whether the challenged acts involved the use of judgment and discretion." *Riddick*, 503 F. Supp. 3d at 426; *see, e.g.*, *Dowdy*, 2014 WL 2002227, at *4 (noting that "whether the employee's actions 'involved judgment and discretion'" is "typically dispositive").

Indeed, the Court finds that the first three factors point toward a finding of immunity, and the parties do not dispute this point. The function performed by the VDOC Defendants — supervising and managing inmates — "falls cleanly within the governmental function of housing inmates and properly operating jails." *Myrick v. NaphCare, Inc.*, 2017 WL 3234384, at *2 (E.D. Va. July 31, 2017). Further, the Commonwealth has "a great interest in — and control over — the housing of inmates and the proper operation of a jail." *Dowdy*, 2014 WL 2002227, at *4; *accord Groves v. Cox*, 559 F. Supp. 772, 774 n.8 (E.D. Va. 1983) (noting that Virginia had a "strong interest and involvement" in administration of its prisons).

The fourth factor, whether the VDOC Defendants' alleged culpable actions involved judgment and discretion, also support a finding of immunity. The facts alleged in the Second Amended Complaint clearly demonstrate the exercise of judgment and discretion by Captain

Johnson, Sergeant Craft, Corrections Officer Moss and Sergeant Norris. As discussed above, the Court finds that Plaintiff has plausibly alleged that each of these VDOC employees delayed in ensuring Duynes' access to medical care on June 1 and 2, 2019. Each of the officers used judgment and discretion to decide whether and when: to allow Duynes' to proceed to medical; to, at times, ignore Duynes in his deteriorating condition; to follow-up with medical personnel themselves; and, to put a team together for Duynes' transportation to the emergency room. Accordingly, sovereign immunity protects the VDOC Defendants from Plaintiff's claim of simple negligence. *See Myrick*, 2017 WL 3234384, at *2-3 (finding sovereign immunity protected jail officers from negligence count where they ignored doctor's order of emergency transport, because they "exercised discretion and judgment in determining how to appropriately handle Hill's medical situation"). The Court will, therefore, grant the VDOC Defendants' Motion to Dismiss Count I against them.

### 2.    Sufficiency of the Allegations

#### a.    *Dr. Picio and Nurse Walker*

The Court finds that Plaintiff has adequately pleaded a claim for negligence against Dr. Picio and Nurse Walker, the only medical provider defendants moving to dismiss Count VI. Plaintiff's claims against Dr. Picio arise from the same familiar factual allegations discussed in the context of deliberate indifference and gross negligence, *supra*, describing Picio's treatment and misdiagnosis of Duynes on October 22, 2018, six days after Duynes first reported his symptoms.

Plaintiff raises her claim against Nurse Walker based on Walker's treatment of Duynes on October 16, 2018, and February 6, 2019. The Second Amended Complaint alleges that, on October 16, 2018, Duynes first reported his stomach pain to Nurse Walker. (2d Am. Compl.

60

¶ 20.) Duynes described extreme pain, a ten on a scale of one to ten, accompanied by excessive sweating, brought on by eating, walking and lying down, and which forced him to "ball up" for relief. (2d Am. Compl. ¶ 20.) Walker examined Duynes, "noted tenderness in the right upper quadrant of his abdomen" and prescribed Mylanta — "an over-the-counter medication to address symptoms of stomach acid." (2d Am. Compl. ¶ 20.) Walker recorded that Duynes needed examination from a "provider." (2d Am. Compl. ¶ 20.)

On February 5, Duynes filed his second grievance with VDOC complaining that Armor was not providing adequate medical evaluation and treatment, and requesting outside help:

> Look, I need to be seen by a [sic] outside doctor or hospital [sic] its [sic] something wrong with my stomach and this prison is not willing to help me with [sic]. I have been in pain for some months now. I let them know my stomach hurt [sic] they put me on blood pressure pills.

(2d Am. Compl. ¶ 33.) The following day, Nurse Walker again examined Duynes, who then complained of ongoing pain and progressing symptoms. (2d Am. Compl. ¶ 34.) Duynes described the pain extending from his right upper quadrant to the lower quadrant and associated vomiting, as well as needing to only eat rice and fish, because all other food exacerbated his symptoms. (2d Am. Compl. ¶ 34.) Nurse Walker noted Duynes' abnormal lab work, pending blood tests and his need for examination by a doctor. (2d Am. Compl. ¶ 34.) Plaintiff alleges that neither Walker nor any other defendant requested or attempted to order any diagnostic testing to determine the cause of his deteriorating medical condition, a condition which was readily diagnosable and treatable if proper medical procedures had been implemented. (2d Am. Compl. ¶ 34.)

The Second Amended Complaint alleges that Picio and Walker, among others, "had a duty of reasonable care in their treatment of Duynes." [11]  (2d Am. Compl. ¶ 140.)  As to Dr. Picio, Plaintiff elaborates that he had a "duty to provide [Duynes] with medical treatment."  (2d Am. Compl. ¶ 147.)  Similarly, Nurse Walker had a "duty to provide [Duynes] with medical care" and a "duty to act" in light of her knowledge of Duynes' ongoing serious medical condition and lack of treatment.  (2d Am. Compl. ¶ 144.)  Plaintiff further avers that Picio and Walker "were duly appointed and actively employed as doctors, nurses, licensed practitioners, and/or trained medical personnel, each acting within the scope of their employment, agency, and servitude for [Armor]."  (2d Am. Compl. ¶ 8.)

Plaintiff alleges that Picio and Walker breached their duties when they "failed to ensure that Duynes received proper physical health evaluations, monitoring, diagnostic testing, and treatment."  (2d Am. Compl. ¶ 142.)  Additionally, Plaintiff alleges that they:  (1) "failed to identify and take all necessary steps to treat or obtain treatment for the decedent's physical health concerns," (2) "failed to monitor the decedent in spite of serious symptoms known to them," (3) "failed to request that the decedent be transported to a hospital emergency room for medical evaluation, diagnostic testing, and treatment in a timely manner," (3) "failed to follow up to make certain that decedent's condition did not worsen after the decedent was sent back to his cell without medical treatment," (4) "failed to respond to reports from corrections officers of the

---

[11]     Although Nurse Walker invites the Court to dismiss Plaintiff's claim because she does not cite the heightened degree of care required of medical personnel, (Mem. Supp. Sykes & Walker Mot. at 19-20 (ECF No. 77) (citing *Beverly Enterprises-Virginia, Inc. v. Nichols*, 441 S.E.2d 1, 4 (Va. 1994) (Virginia Code § 8.01-581.20 establishes, for medical malpractice actions, a duty of "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth."))) the Court finds that Plaintiff's allegations adequately allege duty. *See Riddick*, 503 F. Supp. 3d at 424-25, 432 (allowing simple negligence claim to proceed against jail medical staff without citing heightened duty).

decedent's obvious and serious medical condition," and (5) "failed to ensure that the decedent received necessary emergency medical treatment." (2d Am. Compl. ¶ 143.) Plaintiff supports these allegations of breach with specific citation to Picio's and Walker's encounters with Duynes. (2d Am. Compl. ¶¶ 144, 147.)

Additionally, Plaintiff alleges that Walker "failed to provide the decedent with or facilitate access to any medical treatment, evaluation, or testing for the decedent's ongoing serious medical condition and need and failed to order that the decedent be transported to an appropriate emergency medical facility, as was required by the decedent's known condition." (2d Am. Compl. ¶ 144.) And, Plaintiff states that Picio failed to provide Duynes' with access to medical care, because he "failed to facilitate or administer any medical treatment, failed to order any diagnostic testing or imaging, failed to instruct his subordinates to provide any medical treatment to the decedent, failed to order that the decedent be transported to an appropriate emergency medical facility with staff equipped to provide the necessary medical care for the decedent's condition, and misdiagnosed the decedent with indigestion." (2d Am. Compl. ¶ 147.)

Furthermore, Plaintiff alleges that, "as a direct and proximate result of" Picio and Walker's negligence, Duynes' "was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, during the months leading to the decedent's untimely death on June 2, 2019." (2d Am. Compl. ¶¶ 150, 152.) Plaintiff adds that "pursuant to Virginia Code § 8.01-50.1, [she] has obtained a written certification from a qualified expert that the actions of [Picio and Walker] deviated from the applicable standard of care and that said deviation was the proximate cause of death of the decedent." (2d Am. Compl. ¶ 153.)

As such, the Court finds that the Second Amended Complaint adequately pleads that Picio and Walker owed a duty to provide medical treatment for Duynes' serious medical need

and that they breached that duty, causing Duynes' death.  Therefore, Plaintiff has sufficiently alleged a plausible claim of negligence against Dr. Picio and Nurse Walker, and the Court will deny their motions to dismiss Count VI against them.

**D.    Punitive Damages**

Finally, the Armor Defendants and Nurses Walker and Sykes move to dismiss Plaintiff's claim for punitive damages, disputing the sufficiency of the allegations to support such an award. As to Plaintiff's deliberate indifference claims, the parties agree that punitive damages "are available in § 1983 actions for conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Further, "[t]he callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the § 1983 claim." *Id.* (holding that there was "ample, though disputed, evidence of disregard for [the inmate's] repeated complaints and obvious symptoms" such that "submission of the punitive damages issue to the jury was appropriate").  As discussed above, taking the allegations in the Second Amended Complaint as true and reading them in the light most favorable to Plaintiff, the Court has found that she has adequately stated a claim for deliberate indifference as to Defendants Craft, Moss, Norris, Johnson, Ulep, Semlali and Sykes.  Thus, Plaintiff has adequately alleged these defendants' callous indifference to Duynes, plausibly supporting a claim for punitive damages.

Similarly, with regard to Plaintiff's state law claims, Virginia's Wrongful Death statute provides that "[p]unitive damages may be recovered for willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others." Va. Code Ann. § 8.01-52(5).  The Supreme Court of Virginia has elaborated that "negligence which is so willful or

64

wanton as to evince a conscious disregard of the rights of others, as well as malicious conduct, will support an award of punitive damages." *Owens-Corning Fiberglas Corp. v. Watson*, 413 S.E.2d 630, 640 (Va. 1992). The court defined willful and wanton negligence as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Id.* (citing *Griffin v. Shively*, 315 S.E.2d 210, 213 (Va. 1984); *Infant C. v. Boy Scouts of Am., Inc.*, 391 S.E.2d 322, 327-28 (Va. 1990)). "This definition nearly mirrors the subjective prong of the *Farmer* test, which requires a plaintiff provide 'proof of the official's actual subjective knowledge of both the inmate's serious medication condition and the excessive risk posed by [the official's] action or inaction.'" *Hixson*, 2018 WL 814059, at *9 (quoting *Scinto*, 841 F.3d at 226). Thus, in adequately stating a deliberate indifference claim against Defendants Craft, Moss, Norris, Johnson, Ulep, Semlali and Sykes, Plaintiff has also adequately stated a claim for punitive damages under Virginia's wrongful death statute.

However, an employer cannot be liable for punitive damages based on a theory of *respondeat superior*. *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 478 (Va. 2019). ("In the respondeat superior context, punitive damages cannot be awarded against a master or principal for the wrongful act of his servant or agent in which he did not participate, and which he did not authorize or ratify.") (cleaned up). As Plaintiff has not alleged that Armor participated, authorized or ratified Ulep, Semlali or Sykes' actions and only asserts *respondeat superior* liability against it, the Court will dismiss Plaintiff's punitive damage claims against Armor.

Therefore, the Court will grant in part and deny in part the motions to dismiss the punitive damages claim. The Court will deny the motions as to Defendants Ulep, Semlali and Sykes. However, Plaintiff has only raised a claim for ordinary negligence against Nurses Allen, Seward and Walker; thus, the Court will grant the motions to dismiss the punitive damages claim as to them. *See Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005) ("The difference between ordinary negligence and gross negligence is one of degree; however, the difference between any form of negligence and causes of action for willful and wanton conduct, reckless conduct, or intentional misconduct is a matter of kind."). Additionally, the Court will grant the motion to dismiss the punitive damages claim against Armor. The remaining defendants have not moved for dismissal of the punitive damages claim and, as such, the Court renders no opinion as to the viability of the claim against them.

## IV.    CONCLUSION

For the reasons set forth above, the Court will GRANT IN PART and DENY IN PART the motions to dismiss (ECF Nos. 49, 51, 54, 76). In sum, the Court will dismiss in full Count I, negligence against the VDOC Defendants, and Counts IV and V, deliberate indifference under the theories of supervisory liability and failure to train against Craft, Norris, Johnson, Patel, Ulep and Picio. The Court will dismiss Counts VII, for gross negligence, and VIII, for deliberate indifference, as to Dr. Picio only, and Count XI, seeking punitive damages, as to Armor, Allen,

66

Seward and Walker.  The Court will otherwise deny the motions.  This case shall proceed on

Counts II – III, and VI – XI of the Second Amended Complaint.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak

United States District Judge

Richmond, Virginia
Date:  June 9, 2022